**UNITED STATES of America**

v.

**Oscar CLEMONS, Appellant.**

**No. 87–3239.**

United States Court of Appeals,
Third Circuit.

Argued Sept. 15, 1987.

Decided March 31, 1988.

George E. Schumacher, Federal Public Defender, David G. Rothey (argued), Asst. Federal Public Defender, Pittsburgh, Pa., for appellant.

J. Alan Johnson, U.S. Atty., Constance M. Bowden, Philip A. Ignelzi (argued), Asst. U.S. Attys., Pittsburgh, Pa., for appellee.

Before BECKER and SCIRICA, Circuit Judges and FARNAN, District Judge *.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

Appellant Oscar Clemons raises several issues relating to his conviction on drug-related charges. Only two points, however, merit in-depth treatment. First, Clemons contends the government violated his fifth and sixth amendment rights when the prosecutor used peremptory challenges to strike the only two blacks on the jury panel. *See Batson v. Kentucky*, 476 U.S. 79, 88–98, 106 S.Ct. 1712, 1718–24, 90 L.Ed.2d 69 (1986). Second, he argues that the affirmative defense in the Victim and Witness Protection Act of 1982, 18 U.S.C. § 1512(c) (1982), unconstitutionally shifts the burden of proof by relieving the government of proving each constituent element of the crime charged beyond a reasonable doubt. *Patterson v. New York*, 432 U.S. 197, 204–05, 97 S.Ct. 2319, 2324, 53 L.Ed.2d 281 (1977) (citing *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072–73, 25 L.Ed.2d 368 (1970)); *Mullaney v. Wilbur*, 421 U.S. 684, 685, 95 S.Ct. 1881, 1883, 44 L.Ed.2d 508 (1975). Founded on the fifth amendment, this precept is based on the due process

* The Honorable Joseph J. Farnan, Jr., United States District Judge for the District of Delaware, sitting by designation.

principle long regarded as fundamental—namely, that no individual shall lose his liberty unless the government proves guilt beyond a reasonable doubt. *See In re Winship*, 397 U.S. at 362–64, 90 S.Ct. at 1071–73; *accord Francis v. Franklin*, 471 U.S. 307, 313, 105 S.Ct. 1965, 1970, 85 L.Ed. 2d 344 (1985) ("bedrock, 'axiomatic and elementary'" principle of due process).

For reasons that follow, we will affirm the judgment of the district court, 658 F.Supp. 1116. We hold that even assuming Clemons established a prima facie case of discrimination stemming from the government's use of peremptory challenges, thereby triggering a *Batson* inquiry, the prosecutor's explanation for the peremptory strikes comported with the standard subsequently set forth in *Batson*. In addition, we reject Clemons' attempt to overturn his conviction based on the possible unconstitutionality of 18 U.S.C. § 1512(c) (establishing an affirmative defense to witness tampering if the conduct was lawful and intended to induce truthful testimony). We need not, however, decide the constitutional question. Assuming, for purposes of this appeal, that § 1512(c) unconstitutionally shifts the burden of proving intent to the defendant, any constitutional error was harmless beyond a reasonable doubt.[1]

## I. FACTS AND PROCEEDINGS BELOW

Clemons was charged in a nine-count indictment, tried by a jury, and subsequently convicted of: (1) conspiring to possess and distribute cocaine, percodan, preludin, heroin, and dilaudid, 21 U.S.C. § 846 (Count I); (2) possessing with the intent to distribute heroin and cocaine, *id.* § 841(a)(1) (Counts IV–VII); and (3) knowingly, intentionally and unlawfully intimidating and threatening another person to withhold testimony from an official proceeding, 18 U.S.C. § 1512(a)(1), (2)(A) (Count VIII). The district court sentenced him on July 16, 1985, to concurrent ten-year prison terms, followed by twenty years of special parole.[2] On March 23, 1987, the court denied Clemons' requests for judgment of acquittal and for a new trial.

For purposes of this appeal, we need only examine facts relating to his pretrial voir dire challenge and his involvement with a co-conspirator and immunized witness, Gregory Dennis.

### A. Jury Selection

Immediately following voir dire, Clemons, who is black, made a timely objection to the government's use of peremptory challenges to exclude the only two black members of the jury panel. Although the Supreme Court had not yet decided *Batson*, Clemons noted its pendency and the possibility that the Court would reconsider the holding of *Swain v. Alabama*, 380 U.S. 202, 223–24, 85 S.Ct. 824, 837–38, 13 L.Ed. 2d 759 (1965), in which it required defendants challenging jury selection to establish

---

1. Clemons asserts three other claims on appeal: (1) that the government's immunity grants to others, but not him, violated the equal protection and due process clauses; (2) that he was prejudiced by the delay between sentencing and the district court's final disposition of his post-trial motions; and (3) that the testimony of the government's key witnesses was so inherently untrustworthy that the witnesses were incompetent to testify. Clemons' equal protection/due process and witness competency claims are meritless. We also reject his due process claim of post-trial delays. Although Clemons cites an eighteen-month delay between sentencing and final judgment, some of this delay is attributable to his requests for extensions of time in filing post-trial motions. Moreover, Clemons has failed to demonstrate any prejudice from these delays.

2. We have discretion to invoke the concurrent sentence doctrine to "avoid resolution of legal issues affecting less than all of the counts in the indictment where at least one count has been upheld and the sentences are concurrent." *United States v. Lampley*, 573 F.2d 783, 788 (3d Cir.1978). This court recently reaffirmed the vitality of the doctrine, but recognized its inapplicability when defendants may suffer possible collateral consequences, such as impaired parole eligibility. *See Jones v. Zimmerman*, 805 F.2d 1125, 1128 (3d Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1356, 94 L.Ed.2d 526 (1987). We decline to apply the doctrine here because a ruling in favor of Clemons may well have possible collateral consequences in proceedings before the parole commission. *See id.; United States v. Sebetich*, 776 F.2d 412, 423 n. 17 (3d Cir.1985); *Lampley*, 573 F.2d at 790–91 (Gibbons, J., dissenting).

racially discriminatory acts in multiple cases. Similarly, appellant relied on *McCray v. Abrams*, 750 F.2d 1113, 1124–35 (2d Cir.1984), *vacated and remanded*, 478 U.S. 1001, 106 S.Ct. 3289, 92 L.Ed.2d 705 (1986), in which the Second Circuit departed from *Swain* and established a procedure for challenging racially discriminatory peremptory strikes under the sixth amendment's guarantee that a fair trial necessarily includes a jury comprised of a fair-cross-section of the community. *Id.* at 1126 (citing *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975)).

The court denied Clemons' request for a hearing, but nevertheless directed the prosecutor to state on the record his reasons for striking the only two blacks from the panel. The prosecutor explained:

> My notes indicate that I struck every single person who was nonmarried and young. And both of those people are single, and, of course, not married, and young.

App. at 168.

Eight panel members—numbers 77, 103, 95, 59, 107, 82, 84, and 172—were single. *See* App. at 18 (jury sheet), 20–63 (jury qualification sheets). Of this group, five— numbers 77, 103, 95, 59, and 107—were considered "young," based on the prosecutor's criterion that anyone under age thirty-five is young. The government used peremptory challenges to strike four of the five "young single" individuals, two of whom were black. The fifth individual, a thirty-four-year-old management-level employee was not challenged, but was ultimately struck by Clemons.

Of the remaining single panel members, two—ages fifty and sixty-three, were both selected, and the third, age fifty-eight, was struck by Clemons. Finally, the government used its remaining challenges to strike three married individuals, one of whom was a news reporter vaguely familiar with the case.

### B. Witness Intimidation

At trial, the government presented sufficient evidence that between March, 1981 and August, 1983, Clemons conspired with Ralph Dickinson, Scott Cornish, Donald Bishop, Gregory Dennis, Billy Lee, and others to distribute narcotics in the Uniontown/Brownsville section of Pennsylvania. Cornish, Dennis, Bishop, and two others— all prior felons—testified against Clemons pursuant to a grant of immunity. Our focus is the involvement of Dennis.

Gregory Dennis, who lived in Detroit in 1980–82, testified that his brother, Bishop, introduced him to Clemons. In early 1983, Clemons asked Dennis and Bishop to accompany him to Detroit to obtain heroin from two suppliers Dennis had met during his stay there. According to Dennis, he and Clemons eventually made five or six other trips to Detroit, and on one trip, Clemons showed Dennis the motel where he stayed when he made trips to Detroit with other co-conspirators.

Clemons' § 1512 conviction stems from the following events. On April 27, 1984, the government granted Dennis immunity from prosecution in return for his testimony before the grand jury and in subsequent trials. Dennis testified that on June 9, 1984—after his April grand jury appearance—Clemons approached him in front of his mother's house, where he resided. Clemons said he knew Dennis was scheduled to be a state witness against him and that "his boys wanted to come and do something to [Dennis]...." App. at 397. Dennis said he interpreted the remark to mean that Clemons' boys intended to either "beat me up or hurt me real bad...." App. at 398. In addition, Dennis testified that Clemons also told him that another potential prosecution witness had already reconsidered and refused to testify as promised. Dennis informed the Pennsylvania State Police of the conversation, and said he feared for his life. App. at 398–99, 400.

Clemons again visited the Dennis home on June 25, 1984, asking to speak to Dennis. Dennis remained in the basement, refusing to meet with Clemons, who nonetheless spoke with Dennis's mother Versie. Clemons told Versie Dennis and her companion David Ervin that Dennis probably didn't want to see him because Dennis's

name was on appellant's arrest papers. He then questioned why Dennis would have testified against him, suggested that some people might want to do something to Dennis, and said that he didn't want to get the people from Detroit "riled up." *See* App. at 359, 370–71. Versie Dennis testified that Clemons said he "wouldn't do nothing to [her son], but maybe somebody else would." App. at 357. After Clemons left, Versie Dennis asked Gregory Dennis to leave home because she feared that her other children might be injured. App. at 359. After Versie Dennis testified before a federal grand jury, Clemons returned to her home, but she refused to speak with him. App. at 360. On cross-examination, however, Versie Dennis said Clemons never threatened her and that she feared for her family's safety because she had had other unpleasant experiences with the "drug world." App. at 365–67.

## II. UNCONSTITUTIONAL USE OF PEREMPTORY CHALLENGES

Until the Supreme Court's decision in *Batson*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), defendants challenging a prosecutor's exercise of peremptory strikes as being racially discriminatory were faced with a "crippling burden of proof." *Id.* 106 S.Ct. at 1720. In *Swain*, 380 U.S. at 223–28, 85 S.Ct. at 837–40, the Court had held that although a prosecutor's use of peremptory challenges was subject to the equal protection clause, defendants could trigger judicial inquiry into a prosecutor's motives only by showing a long-term pattern of striking blacks. In the two decades following *Swain* "almost no other defendants ... have met this standard of proof...." *McCray*, 750 F.2d at 1120.

■ In *Batson*, the Court held that use of peremptory challenges to strike blacks from a jury panel may raise an inference of discrimination requiring the prosecutor to come forward with a racially neutral explanation for his action. *Batson*, 106 S.Ct. at 1723. In order to invoke judicial scrutiny, however, a defendant must first establish a prima facie case of discrimination. The Court noted that this threshold requirement is satisfied when the defendant shows "he is a member of a cognizable racial group ... and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." *Id.* (citations omitted). In assessing the sufficiency of defendant's showing, courts may consider all relevant circumstances, including: (1) the fact that peremptory challenges permit a prosecutor predisposed to discriminate to do so; (2) any other pattern of discriminatory conduct; and (3) any prosecutorial statements. *Id.*

■ Once a defendant establishes a prima facie case, the prosecutor must then give a neutral, nonpretextual explanation for challenging members of that racial group. *Id.* (citing *McCray*, 750 F.2d at 1132; *Booker v. Jabe*, 775 F.2d 762, 773 (6th Cir.1985), *vacated and remanded sub nom. Michigan v. Booker*, 478 U.S. 1001, 106 S.Ct. 3289, 92 L.Ed.2d 705 (1986)). Although the reason need not approach the level justifying a challenge for cause, the Court emphasized that the prosecutor must assert a clear, specific reason beyond "his intuitive judgment" or "his good faith." *Batson*, 106 S.Ct. at 1723–24 & n. 20. Moreover, the Court observed that because the trial court's determination of the proffered reason turns on issues of credibility and on the factual context of the case, appellate courts must accord factual findings on the issue of purposeful discrimination "great deference." *Id.* at 1723–24 & n. 21.[3]

---

**3.** Although *Batson* was not decided at the time of Clemons' conviction, it applies here because this litigation was not final when the Court decided *Batson*. *See Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 720, 93 L.Ed.2d 649 (1987). Indeed, the government concedes this point.

We also note that Clemons challenged the government's conduct as violative of the fifth and sixth amendments. In *Batson*, the court expressly avoided basing its decision on the sixth amendment. *See Batson*, 106 S.Ct. at 1716 n. 4 (resolution of petitioner's claim turns on the equal protection clause; expressing no view on the merits of the sixth amendment claim).

Although the district court, "out of an abundance of caution," App. at 168, instructed the prosecutor to justify his reasons, the court never determined whether Clemons satisfied the threshold requirement of a prima facie case of discrimination. As we shall demonstrate, *see infra*, this omission does not require remand.

On appeal, the government urges us to adopt a per se rule that no prima facie case of purposeful discrimination exists unless a certain number or percentage of the challenged jurors are black. Specifically, the government contends that Clemons could not have established a prima facie case because although two blacks were struck, no discriminatory inference arises when they were the only blacks on the panel, and most likely would have been struck in any event. We reject such a rule as contrary to the letter and spirit of *Batson*.

In *Batson*, the prosecutor used peremptory challenges to strike all four blacks on the panel, thereby permitting an all-white jury to judge a black defendant. *Batson*, 106 S.Ct. at 1715. Nevertheless, in fashioning its requirement of a prima facie case, the Court rejected any per se rule. Instead, the Court expressly required trial courts to "consider all relevant circumstances," including, but not limited to, a consistent pattern of strikes against black jurors and a prosecutor's questions and statements during the voir dire process. *Id.* at 1723. Although the Court emphasized that peremptory challenges constitute a practice easily suited to racial discrimination, it noted the important role played by trial judges experienced in supervising voir dire. *See id.* We too recognize the pivotal role of the trial judge in determining a prima facie case. *See United States v. Forbes*, 816 F.2d 1006, 1010 (5th Cir.1987);

*United States v. Allen*, 814 F.2d 977, 978 (4th Cir.1987); *United States v. Woods*, 812 F.2d 1483, 1487 (4th Cir.1987).

Accordingly, we find that establishing some magic number or percentage to trigger a *Batson* inquiry would short-circuit the fact-specific determination expressly reserved for trial judges. "*Batson* does not require that the government adhere to a specific mathematical formula in the exercise of its peremptory challenges." *United States v. Montgomery*, 819 F.2d 847, 851 (8th Cir.1987).

The government relies primarily on *Commonwealth v. Robinson*, 382 Mass. 189, 195, 415 N.E.2d 805, 809–10 (1981), in which the court found no prima facie case where the defendant was black, the victim was Asian, and the prosecutor excluded three of four black jurors, and *People v. Rousseau*, 129 Cal.App.3d 526, 536–37, 179 Cal.Rptr. 892 at 897–98 (1982), in which the court found no prima facie case where defendant relied solely on the fact that the prosecutor struck the only two blacks on the panel. To the extent these decisions may support the government's position, they were decided before *Batson* and we do not find them persuasive. Moreover, we are unable to discern any per se rule supporting the government's theory. In *Robinson*, the court acknowledged it must consider multiple factors before finding an inference of discrimination. *Robinson*, 382 Mass. at 195, 415 N.E.2d at 810. Similarly, in *Rousseau*, the court expressly required a complete examination of all relevant circumstances. *Rousseau*, 129 Cal.App.3d at 536–37, 179 Cal.Rptr. at 897–98.

At least one court of appeals seems to have fashioned a per se rule establishing a prima facie case whenever all members of defendant's race are struck without cause.

The equal protection analysis of the fifth amendment, which governs this case, is identical to that used for the fourteenth amendment. *See Buckley v. Valeo*, 424 U.S. 1, 93, 96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976) (per curiam); *United States v. Williams*, 822 F.2d 512, 514 (5th Cir. 1987) (citing *United States v. Forbes*, 816 F.2d 1006, 1009 n. 6 (5th Cir.1987) (equal protection analysis of *Batson* applies to federal prosecutions through the fifth amendment)). Moreover, the Court's opinion in *Batson* incorporated

many of the same safeguards set forth by lower courts under the sixth amendment. *See, e.g., McCray*, 750 F.2d 1113, 1132 (2d Cir.1984), *vacated and remanded*, 478 U.S. 1001, 106 S.Ct. 3289, 92 L.Ed.2d 705 (1986); *see also Roman v. Abrams*, 822 F.2d 214, 225, 226 (2d Cir.1987) (*Batson* framework for evaluating equal protection claim is the same as that used for similar inquiry under the sixth amendment). Thus, appellant's claim is governed by *Batson*.

In *United States v. Chalan,* 812 F.2d 1302, 1314 (10th Cir.1987), the court concluded that where three of four Indian jurors were removable for cause and the government struck "the last remaining juror of defendant's race," the defendant had established a prima facie case raising an inference of racial discrimination. Whenever the government strikes all members of defendant's race, the court concluded, *Batson* requires the prosecutor to explain his reasons. *Id.* The court, however, cautioned that striking "a single juror of defendant's race may not always be sufficient to establish a prima facie case." *Id.*

The Ninth Circuit, in dicta, appears to advocate a contrary rule. In *United States v. Vaccaro,* 816 F.2d 443, 457 (9th Cir.1987), *cert. denied, Alvis v. United States,* — U.S. —, 108 S.Ct. 262, 98 L.Ed.2d 220 (1987), the court concluded that striking the only two black veniremen fails to satisfy *Batson*'s requirement that defendants establish a pattern of systematically excluding blacks. In *Vaccaro,* however, the court concluded that defendants could not have made out a prima facie case because the defendants were not black. *Id.* *Batson,* the court noted, requires proof that the excluded jurors were members of defendants' cognizable racial group. *Id.*

Other post–*Batson* decisions have eschewed a bright-line rule. In *Montgomery,* 819 F.2d at 851, for example, the Eighth Circuit declined to remand for a determination of a prima facie case where blacks had been struck at a proportionate rate twice as high as whites. Refusing to invoke a mathematical formula, the court observed that the prosecutor did not strike two of the four blacks on the panel, and that the jury ultimately included a black. *Id.* In *Allen,* 814 F.2d at 977–88, the court held

that the district court must independently assess the existence of a prima facie case even where the prosecutor allowed three blacks to become jurors.

Striking a single black juror could constitute a prima facie case even when blacks ultimately sit on the panel and even when valid reasons exist for striking other blacks. *See United States v. Gordon,* 817 F.2d 1538, 1541 (11th Cir.1987) (citing *United States v. David,* 803 F.2d 1567, 1571 (11th Cir.1986)), *vacated on reh'g in part on other grounds,* 836 F.2d 1312 (11th Cir.1988). Similarly, we doubt the significance of including a single black on a panel if, at the same time, the government used most of its peremptory challenges (*e.g.,* thirteen of sixteen)[4] to strike blacks with backgrounds similar to the white jurors ultimately selected. In that case, the mere presence of a single black on the jury would not necessarily prevent a finding of a prima facie case. Therefore, adoption of a per se rule, such as that established in *Chalan,* may well serve to insulate some types of discriminatory jury selection practices. For example, some courts have concluded that *Batson* does not apply unless the prosecutor strikes all black jurors. *See United States v. David,* 662 F.Supp. 244, 246 (N.D.Ga.1987) (although eight of ten potential black jurors were struck, *Batson* inapplicable because prosecutor could have struck all black jurors); *Fleming v. Kemp,* 637 F.Supp. 1547, 1553 (M.D.Ga.1986) (no prima facie case under *Batson* when number of blacks on the panel was small and when prosecutor did not strike all blacks even though he could have done so), *aff'd* 837 F.2d 940 (11th Cir.1988).

▪ In view of the various jury selection practices and the unique racial makeup of each judicial district, we are unwilling to

**4.** Indeed, the district court in *United States ex rel Yates v. Hardiman,* 656 F.Supp. 1006, 1016 (N.D.Ill.), *rev'd* 830 F.2d 195 (7th Cir.1987), was confronted with this factual situation. Applying a sixth amendment analysis, the court found a prima facie case and declined to allow the presence of a single black on the jury to excuse the prosecutor's conduct. The Seventh Circuit subsequently held, however, that the sixth amendment's guarantee of a fair cross-section of the

community in the jury pool does not also guarantee the same representation in a petit jury. *See Teague v. Lane,* 820 F.2d 832, 843 (7th Cir.1987), *cert. granted* — U.S. —, 108 S.Ct. 1106, 99 L.Ed.2d 268 (1988). As a result, the court reversed *Hardiman* in a summary order. *See* 830 F.2d 195. Although we are barred from relying on *Hardiman,* we cite it to illustrate the shortcomings of per se rules.

depart from *Batson*'s reliance on the trial judge's expertise in assessing a prima facie case. Although it may be easier to establish a prima facie case when all blacks are excluded from a jury, or when one or two blacks are excluded from a panel in a district with a relatively low black population, we cannot say the conclusion is automatic. Indeed, *Batson* presented a case in which all blacks were excluded, *see* 106 S.Ct. at 1715, and the Court declined to adopt a bright-line rule. *Id.* at 1723. Nor can we conclude that inclusion of blacks on a jury bars a prima facie case, especially where other facts and circumstances may constitute an inference of prosecutorial discrimination in the selection process.

■ When assessing the existence of a prima facie case, trial judges should examine all relevant factors, such as: how many members of the "cognizable racial group" (in this case, blacks) are in the panel; the nature of the crime; and the race of the defendant and the victim. *See generally United States v. Allen,* 666 F.Supp. 847, 854 (E.D.Va.1987) (outlining possible factors relevant to a *Batson* prima facie case inquiry). In addition, *Batson* itself lists two "illustrative" examples of relevant factors: (1) a pattern of strikes against black jurors in a particular venire; and (2) a prosecutor's questions and statements during the selection process. *Id.* 106 S.Ct. at 1723.[5] Like the Supreme Court, our reference to certain factors is intended to assist trial courts in focusing their inquiry. Our discussion should not be construed as barring trial judges from addressing other facts and circumstances or as binding trial judges by our illustrative list. Indeed, the Supreme Court stressed that trial judges must consider "all relevant circumstances" that might give rise to an "inference of purposeful discrimination." *Id.*

In sum, we reject the government's position that there could be no prima facie case of discrimination under *Batson* because only two blacks were struck;[6] rather such a finding would clearly have been permissible here.

■ For purposes of this appeal we assume that Clemons could satisfy the *Batson* standard for establishing a prima facie case. Accordingly, we must determine whether the prosecutor articulated a racially neutral, nonpretextual reason for excluding the only two black jurors from the panel in this case.

When challenged by the court, the prosecutor explained he was striking young, single panel members. His explanation is logical in the context of a narcotics prosecution. The only young, single individual not struck was age thirty-four, at the outer edge of the prosecutor's admittedly subjective age limit, and held a management-level position. The prosecutor's justification was "clear and reasonably specific," and exceeded the self-serving explanations expressly rejected by the Court in *Batson.* *See id.* at 1723–24 & n. 20 (intuition and good faith insufficient to rebut prima facie case).[7] Moreover, the Court in *Batson* did

---

5. Situations may arise where trial judges find it relevant to examine other factors, such as the percentage of the "cognizable racial group" in the jury pool, or the racial composition of the district. We do not envision such inquiries as mandatory. Rather, we are confident that trial judges shall make determinations concerning the relevance of these statistical factors when appropriate.

6. The government's proposed per se rule would be particularly pernicious in a district like the Western District of Pennsylvania, which has a relatively low black population. Black defendants would more often than not be forced to forfeit their rights under *Batson* merely because of the statistical likelihood that their jury venires will be overwhelmingly non-black.

7. *Compare Roman v. Abrams,* 822 F.2d 214, 228 (2d Cir.1987) (explanation that potential jurors' knowledge of electronics, bookkeeping, and computers justified their exclusion because it might prevent them from accepting reasonable doubt standard of proof is unworthy of belief under *Batson* ); *Chalan,* 812 F.2d 1302, 1314 (10th Cir.1987) (general reference to juror's unsatisfactory background and unspecified dissatisfaction with answers in juror's questionnaire fail to satisfy *Batson* ); *Clark v. City of Bridgeport,* 645 F.Supp. 890, 893–94 (D.Conn.1986) (reliance on instinct and belief that blacks "make the most of civil rights claims" insufficient under *Batson* ) *with Forbes,* 816 F.2d 1006, 1010–11 (5th Cir.1987) (hostile posture/demeanor of one juror and fact that another panel member's children had experienced trouble with the law were permissible reasons under *Batson* ); *United*

not handcuff a prosecutor's legitimate exercise of peremptory strikes. Although the Court condemned the practice of abusing peremptory challenges to further discriminatory ends, it reaffirmed the importance of peremptory challenges as a trial procedure, and declined an invitation to abolish the process. *See id.* at 1724 & n. 22.

Accordingly, the prosecutor's explanation complied with the *Batson* standard, and Clemons' *Batson* claim must be rejected.

## III. CONSTITUTIONALITY OF 18 U.S.C. § 1512(c)

Clemons was charged with using threats and intimidation with the intent of influencing another person's testimony and inducing that person to withhold testimony. *See* App. at 15 (Indictment, Count VIII); 18 U.S.C. § 1512(a)(1), (2)(A). The affirmative defense, meanwhile, permits a defendant to establish that the conduct "consisted solely of lawful conduct *and*" was undertaken with the sole intent "to encourage, induce, or cause the other person to testify truthfully." *See* 18 U.S.C. § 1512(c) (emphasis supplied).[8]

Clemons' constitutional argument is straightforward. He contends that by requiring him to show that his conduct was lawful and carried out with an intent to encourage truthful testimony, Congress has forced him to "come forward with direct opposing evidence of 'intent....'" *See* Brief for Appellant at 14. The government, meanwhile, contends that the statute is constitutional because § 1512(a)(1), (2)(A) requires it to establish every element of the

*States v. Ratcliff,* 806 F.2d 1253, 1256 (5th Cir. 1986) (in Internal Revenue Service prosecution, fact that struck juror fell asleep during voir dire and had prior problems with the IRS satisfied *Batson*), *cert. denied,* — U.S. —, 107 S.Ct. 1625, 95 L.Ed.2d 199 (1987).

8. Section 1512 states in relevant part:
**Tampering with a witness, victim, or an informant**
(a) Whoever knowingly uses intimidation or physical force, or threatens another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—
(1) influence the testimony of any person in an official proceeding;
(2) cause or induce any person to—

offense. Indeed, the statute unambiguously requires the government to establish: (1) the knowing use of intimidation, physical force, or threats; and (2) the intent to influence the testimony of another person in an official proceeding or the intent to cause or induce another person to withhold testimony. Accordingly, the government argues, by permitting a defendant to establish lawfulness or good intentions, § 1512(c)'s affirmative defense provides a defendant with an opportunity "to prove additional facts, which would make otherwise illegal conduct lawful." *See* Brief and Supplemental Appendix on Behalf of the United States at 33 (citing *United States v. Kalevas,* 622 F.Supp. 1523 (S.D.N.Y.1985)).

### A. Is a Constitutional Issue Presented?

Our inquiry, of course, must proceed within the bounds of the caveat that assessing the constitutionality of an Act of Congress is our "gravest and most delicate duty." *Blodgett v. Holden,* 275 U.S. 142, 148, 48 S.Ct. 105, 107, 72 L.Ed. 206 (1927) (Holmes, J., concurring); *see also Walters v. National Ass'n of Radiation Survivors,* 473 U.S. 305, 319, 105 S.Ct. 3180, 3188, 87 L.Ed.2d 220 (1985). Congress, like the judiciary and the executive, exists under a mandate to support and uphold the Constitution. U.S.Const. art. VI, cl. 3. *See Rex v. CIA Pervana De Vapores, S.A.,* 660 F.2d 61, 65 (3d Cir.1981), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 441 (1982).

Similarly, we must refrain from deciding a constitutional question unless necessity

(A) withhold testimony, or withhold a record, document, or other object, from an official proceeding;
....
shall be fined not more than $250,000 or imprisoned not more than ten years, or both.
....
(c) In a prosecution for an offense under this section, it is an affirmative defense, as to which the defendant has the burden of proof by a preponderance of the evidence, that the conduct consisted solely of lawful conduct and that the defendant's sole intention was to encourage, induce, or cause the other person to testify truthfully.

obliges us to do so. *Ashwander v. TVA,* 297 U.S. 288, 341, 345, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (citing *Burton v. United States,* 196 U.S. 283, 295, 25 S.Ct. 243, 245, 49 L.Ed. 482 (1905)); *Kranson v. Valley Crest Nursing Home,* 755 F.2d 46, 50 (3d Cir. 1985); *Stoner v. Presbyterian Univ. Hosp.,* 609 F.2d 109, 111 (3d Cir.1979) (per curiam). This prudential rule of avoiding premature or unnecessary constitutional pronouncements is firmly established in our jurisprudence. *E.g., Superintendent v. Hill,* 472 U.S. 445, 453, 105 S.Ct. 2768, 2773, 86 L.Ed.2d 356 (1985); *Jean v. Nelson,* 472 U.S. 846, 854, 105 S.Ct. 2992, 2997–98, 86 L.Ed.2d 664 (1985); *Berkemer v. McCarty,* 468 U.S. 420, 445–46, 104 S.Ct. 3138, 3153–54, 82 L.Ed.2d 317 (1984) (Stevens, J., concurring).

As a threshold matter, we must determine whether the affirmative defense of § 1512(c) was implicated here. If the affirmative defense was not implicated by argument or evidence at trial, or was not presented to the jury in the court's charge, we must avoid deciding the constitutional question. This case is troublesome because although the statute requires the defendant to prove the § 1512(c) defense, Clemons did not expressly invoke the statute, or the defense it sets forth, until the charging conference. Moreover, in its jury instruction, the court attempted to avoid the burden-shifting problem by rephrasing the statutory requirements to relieve Clem-

ons of the burden of establishing the defense. For reasons that follow, we conclude that despite the court's attempt to modify § 1512(c), the jury could have reasonably concluded that Clemons bore the burden of proving he induced Dennis to testify truthfully.

The applicability of § 1512(c) arose when Clemons, despite doubts as to the section's constitutionality, *see* Jeffries, *The New Federal Witness Tampering Statute,* 22 Am.Crim.L.Rev. 1, 16 (1984), requested an instruction on that provision. Clemons, however, asked the court to label § 1512(c) a "defense" and to ignore the statute by requiring the government to bear the burden of disproving the defense beyond a reasonable doubt.

Following a lengthy debate, *see* App. at 1767–95, the court described § 1512(c)'s "affirmative defense" as a "defense," and declined to read the statutory language to the jury. *See* Supp.App. at 1794.[9] Specifically, the court instructed the jury that: (1) Clemons never has a burden to prove anything, including the affirmative defense of § 1512(c); (2) the government always maintains the burden of proving all elements of the offense; and (3) Clemons must be found not guilty "if it is proved" that his conduct was lawful and undertaken with the sole intent to cause Dennis to testify truthfully. *See* Supp.App. at 1786, 1788–95.[10] The critical portion of the charge was:

---

9. With respect to § 1512(a), which sets forth the elements of the offense, the court recited the statutory language, *see* Supp.App. at 1787, but in its discussion of § 1512(c), the "affirmative defense," the court paraphrased the statute as follows:

It is a defense to ... Count 8, concerning threats and intimidation ... if Oscar Clemons' conduct toward Greg Dennis consisted solely of lawful conduct, and that Oscar Clemons' sole intention was to testify truthfully rather than to testify falsely or not at all....

*See* Supp.App. at 1794. The court avoided any mention of the statutory requirement concerning a defendant's burden of proof under § 1512(c). *See id.* Nevertheless, the court expressly refused to charge that the "government has the burden of disproving the [§ 1512(c)] defense by proof beyond a reasonable doubt." *United States v. Clemons,* 658 F.Supp. 1116, 1124 (W.D.Pa.1987).

10. With respect to 1512(c), the court instructed:

[I]t is a defense to that count if Oscar Clemons' conduct toward Greg Dennis consisted solely of lawful conduct, and that Oscar Clemons' sole intention was to encourage, induce, or cause Greg Dennis to testify truthfully rather than to testify falsely or not at all.

Now, the defendant—I want to emphasize this—the defendant has no duty or burden to advance this defense. His failure to advance or prove such a defense shall not be held against him under any circumstances because, as I said earlier, and I will repeat again for the third, fourth, or fifth or however many times, the defendant has no burden to prove anything. The defendant has no burden to advance any evidence at all. He has no duty to testify.

But, however, if you're of the belief from all the evidence you heard in this case that Oscar

All of those things have to be proved, each one of them, beyond a reasonable doubt by the government regardless of that matter that I have just mentioned concerning the fact that Clemons' conduct may have been solely lawful and proper. So the government always has the burden. Mr. Clemons has no burden of proving anything of any kind. However, if it is proved that his conduct consisted solely of lawful conduct and that his sole intention was to encourage, induce or cause Greg Dennis to testify truthfully, then he would be found not guilty of that charge.

Supp.App. at 1795.

Although the court emphasized the government's burden of proof and Clemons' corresponding lack of burden at seventeen different points in its charge on Count Eight (§ 1512), *see* Supp.App. at 1786–89; 1794–95, we conclude that the court's instruction that, "Clemons must be found not guilty if it is proved....", was sufficient to place the burden-shifting aspect of § 1512(c) before the jury.

To be sure, we must read jury instructions in their entirety, *see Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 400–01, 38 L.Ed.2d 368 (1973). Nevertheless, a reasonable jury could have concluded that the "if it is proved" language required Clemons to prove the § 1512(c) defense. Indeed, because the government had introduced evidence that Clemons intimidated Dennis, the court's instruction raises the question: who else but Clemons would prove that Clemons has a defense to the

§ 1512 prosecution? No reasonable juror could conclude that the government was required to prove Clemons guilty and not guilty of the same charge.[11]

The Supreme Court recently addressed a similar problem in *Francis v. Franklin,* 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985). In determining whether a jury instruction relieved the government of proving every element of an offense beyond a reasonable doubt, *see Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979); *In re Winship,* 397 U.S. at 364, 90 S.Ct. at 1072–73, the court examined the following passage in the context of the entire charge:

'[t]he acts of a person of sound mind and discretion are presumed to be the product of the person's will, but the presumption *may be rebutted* and ... [a] person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts but the presumption *may be rebutted.*'

*Francis,* 471 U.S. at 309, 105 S.Ct. at 1968 (emphasis added). The Court held that the instruction violated the due process clause because it created a mandatory burden-shifting presumption. *Id.* at 325, 105 S.Ct. at 1977. Specifically, the Court noted, "the very statement that the presumption 'may be rebutted' could have indicated to a reasonable juror that the defendant bore an affirmative burden of persuasion once the State proved the underlying act giving rise to the presumption." *Id.* at 318, 105 S.Ct. at 1973.

---

Clemons' conduct towards Greg Dennis was lawful conduct, that his intention was to encourage, induce or cause Greg Dennis to testify truthfully, you will find the defendant not guilty on that charge....

... So the government always has the burden. Mr. Clemons has no burden of proving anything of any kind. However, if it is proved that his conduct consisted solely of lawful conduct and that his sole intention was to encourage, induce or cause Greg Dennis to testify truthfully, then he would be found not guilty of that charge.

But again I repeat that the defendant has no burden or duty to advance any defenses. He has no duty or burden to testify. He has no duty or burden to put forth witnesses or evi-

dence. He has no duty to testify on his own behalf....

*Id.* at 1794–95.

11. The court's use of the "if it is proved that" language in describing the requirements of § 1512(c), illustrates the shortcomings of using the passive voice to describe which party bears the burden of proof in a criminal statute. The passive voice is desirable "[w]hen the agent performing the action is thought of as too unimportant or too obvious to mention and is less significant than the object of the action ... [or] [w]hen the agent performing the action is indefinite or unknown." *See* T. Bernstein, *The Careful Writer* 14–15 (1983); *see generally* W. Strunk Jr. & E.B. White, *The Elements of Style* 18 (3d ed. 1979). None of those situations apply here.

In the course of its holding, and most important for purposes of our inquiry, the Court rejected the government's claim that earlier portions of the charge—emphasizing the government's burden and the defendant's "presumed innocent" status— "explained the proper allocation of burdens with sufficient clarity." *Id.* at 319, 105 S.Ct. at 1973. The Court explained that a reasonable juror could interpret general instructions on the parties' respective burdens as being consistent with the improper burden-shifting presumption. Specifically, the Court observed, a reasonable juror could believe that the government's evidence constituted proof beyond a reasonable doubt "unless the defendant persuaded the jury otherwise." *Id.* at 319, 105 S.Ct. at 1974 (citing *Sandstrom*, 442 U.S. at 518–19 n. 7, 99 S.Ct. at 2456 n. 7; *Mullaney*, 421 U.S. at 703 n. 31, 95 S.Ct. at 1891–92 n. 31). "[G]eneral instructions as to the prosecution's burden and the defendant's presumption of innocence do not dissipate the error in the challenged portion of the instructions." *Francis*, 471 U.S. at 319–20, 105 S.Ct. at 1974.

The Court's determination in *Francis* that the ambiguous jury instruction in that case violated due process convinces us that a comparable shortcoming in this jury charge at least presents for our review the constitutional issue of § 1512(c)'s validity. Although the court's repeated references to Clemons' lack of burden of proving anything in this case raises a close question, a reasonable jury could have understood the challenged portion of the charge as requiring defendant to disprove the crucial element of intent.

### B. Constitutionality of § 1512(c)

Merely labelling something an affirmative defense does not mean the statute is constitutional. "[I]t must appear that the so-called defense does not in actuality negate any element of the crime." 1 W. LaFave & A. Scott, *Substantive Criminal Law* § 1.8, at 75 (1986); *see generally Sandstrom*, 442 U.S. at 520, 99 S.Ct. at 2457. A defendant may be required to bear the burden of persuasion with respect to defenses such as those showing justification or excuse, but not with respect to those that "negative guilt by cancelling out the existence of some required element of the crime." W. LaFave & A. Scott, *supra*, at 71, 75. Accordingly, in assessing the constitutionality of an affirmative defense, we must inquire whether "the defense is defined in terms of a fact so central to the nature of the offense that, in effect, the prosecution has been freed of the burden" of establishing each constituent element of the crime charged beyond a reasonable doubt. *See id.* § 2.13, at 233; *accord In re Winship*, 397 U.S. at 364, 90 S.Ct. at 1072–73 (prosecution must prove beyond a reasonable doubt every fact necessary to constitute the charged crime).

Consistent with these principles, two views have emerged concerning the constitutionality of § 1512(c). In *United States v. Kalevas*, 622 F.Supp. 1523 (S.D.N.Y. 1985), the court upheld the provision, reasoning:

> The elements of the affirmative defense, the lawful nature of the conduct and the intent to encourage, induce, or cause truthful testimony, are independent facts, proof of which would be sufficient to avoid criminal liability.... The government, to prevail ... must prove the essential ingredients of the crime charged before it may obtain a conviction; thus section 1512(c) meets the demands of the Due Process Clause.

*Id.* at 1527 (citations omitted).

At least one commentator casts doubt on this reasoning. *See* Jeffries, *supra*, at 16–20. He asserts that the government's burden of proving the elements of § 1512(a), *i.e.*, "that the defendant (i) knowingly (ii) engaged in intimidation, force, threats or misleading conduct (iii) with the intent to influence testimony," does not require it to prove the nonexistence of the affirmative defense. *Id.* at 17.

When it enacted § 1512(c), Congress intended it to apply primarily in situations where prosecutors or judges warn a witness of a possible perjury prosecution. *See* S.Rep. No. 97–532, 98th Cong.2d Sess. 19, *reprinted in* 1982 U.S.Code Cong. & Ad-

min.News 2515, 2525 & n. 15. Congress based § 1512(c) on a recommendation in the Final Report of the National Commission on Reform of Federal Criminal Laws § 1321(3)(a) (1971) ["Final Report"]. In the Final Report, however, "existence of the stated circumstance was a defense, not an affirmative defense. Thus the burden would have been on the government to prove its nonexistence." Jeffries, *supra,* at 16; *see generally* Final Report at 114. The legislative history is silent on why Congress modified the Final Report to place the burden of proving the defense on defendants.

The concerns raised in the Jeffries commentary, combined with Supreme Court precedent and established principles of constitutional law, raise doubts concerning the constitutionality of § 1512(c). We need not decide this question, however, because even assuming the statute is unconstitutional, and the court's jury instruction was erroneous, the constitutional error was harmless beyond a reasonable doubt.

### C. *Constitutionally Harmless Error*

■ Since concluding that some errors of constitutional dimension could be harmless, *see Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967), the Supreme Court has " 'repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' " *Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 3105, 92 L.Ed.2d 460 (1986) (citing *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)).

In *Rose,* the Court resolved a question that had been in doubt since its plurality opinion in *Connecticut v. Johnson,* 460 U.S. 73, 103 S.Ct. 969, 74 L.Ed.2d 823 (1983), concerning whether unconstitutional burden-shifting instructions could ever constitute harmless error. Specifically, the Court held, when a jury is improperly instructed to presume malice from predicate facts, the due process violation "is not 'so basic to a fair trial' that it can never be

harmless." *Rose,* 106 S.Ct. at 3107. The Court then remanded to the court of appeals for a determination whether the unconstitutional burden-shifting on the critical issue of intent was harmless beyond a reasonable doubt. *Id.* at 3109.

More recently, in *Burger v. Kemp,* —— U.S. ——, 107 S.Ct. 3114, 3120 n. 5, 97 L.Ed.2d 638 (1987), the Court reaffirmed its holding. Assuming the trial court's burden-shifting charge was unconstitutional, the Court observed, " 'the evidence was so dispositive of intent' that it can be said beyond a reasonable doubt that 'the jury would have found it unnecessary to rely on the presumption.' " *Id.* (citing *Rose,* 478 U.S. 570, 106 S.Ct. 3101, 3109, 92 L.Ed.2d 460). This standard does not suggest that courts can somehow retrace the jury's deliberative process. Rather, it requires us to find "that the facts found by the jury were such that it is clear beyond a reasonable doubt that if the jury had never heard the impermissible instruction its verdict would have been the same." *Pope v. Illinois,* —— U.S. ——, 107 S.Ct. 1918, 1922 n. 6, 95 L.Ed.2d 439 (1987) (interpreting *Rose* ).

Our review of the record demonstrates that the government's evidence of Clemons' intent was "so dispositive," *see Burger,* 107 S.Ct. at 3120 n. 5; *Rose,* 106 S.Ct. at 3109, that even if the judge had not given the "if it is proved" instruction, and had placed the burden on the government, the jury's verdict would have been the same, *i.e.,* the jury would have had to conclude that Clemons was not attempting to induce Dennis to testify truthfully.

Although we question whether Clemons ever raised the § 1512(c) defense, we assume for purposes of appeal that he implicitly raised it through scattered cross-examination and obscure references in closing argument. For example, he appeared to defend against the intimidation charge by eliciting on cross-examination that he never directly threatened Dennis' mother, *see* App. at 366–67 (Versie Dennis: Clemons never threatened me); *see also* App. at 376–77 (Versie Dennis's housemate, David Ervin: Clemons never threatened me). In addition, during his cross-examination of

Gregory Dennis, Clemons asked questions attempting to indicate that his threatening remarks to Dennis were in retaliation for having him arrested, not to induce Dennis not to testify truthfully. *See*, App. at 649 (cross-examination of Gregory Dennis). He also contended that his interest in speaking with Gregory Dennis was to "find out what [was] happening"; not to threaten anyone. *See* App. at 1877 (closing argument). Finally, we note that Clemons' counsel acknowledged that his client had requested a § 1512(c) jury instruction even though the record was devoid of any evidence relating to that statutory provision. *See* App. at 1796–97, 1798.

The government's evidence, meanwhile, disproves beyond a reasonable doubt that Clemons' conduct was lawful and that his sole intent was to induce Dennis to testify truthfully. After Dennis testified against Clemons before the grand jury, Clemons approached him and stated that: (1) he knew Dennis was scheduled to be a state witness against him; and (2) "his boys" wanted to "do something to [Dennis]," but that Clemons had "played them off, told them that he wasn't sure if [Dennis] was the one that was supposed to have testified against him or not." Dennis said he feared Clemons' boys planned to "beat me up" or "hurt me real bad." In addition, Dennis testified that Clemons informed him that another potential prosecution witness had already reconsidered her decision to cooperate. At this point, Dennis was so fearful he contacted the state police. The government also established that when Clemons spoke to Dennis' mother, he made similar threats to harm Dennis. On cross-examination of Dennis and his mother, Clemons never raised the possibility that his statements had been made in an attempt to induce Dennis to testify truthfully, nor, insofar as we can ascertain, did he so argue to either the court or to the jury. Instead,

Clemons' cross-examination elicited only testimony that he never threatened Dennis' mother or other members of her household.

Thus, the government's direct evidence of Clemons' witness intimidation also establishes that the government effectively disproved the defense beyond a reasonable doubt.[12] Even if Clemons' evidence can be viewed as supporting the § 1512(c) defense, which we seriously doubt, "the predicate facts conclusively establish[ed] intent, so that no rational jury could find" that Clemons intended to induce Dennis to testify truthfully. *See Rose*, 106 S.Ct. at 3108.[13] Here the jury was instructed that the government bore the burden of proving facts establishing each element of the crime set forth in § 1512(a). In meeting this burden, the government also disproved beyond a reasonable doubt that Clemons' conduct was nevertheless lawful and undertaken with the noble purpose of inducing Dennis to testify truthfully. *Cf.* Final Report at 115 (comment) ("so long as the actor is seeking truthful testimony, he may threaten lawful harm, *e.g.*, to seek a perjury prosecution"); *accord* S.Rep. at 19, *reprinted in* U.S.Code Cong. & Admin.News at 2525.

This is not a case in which the court's instruction prevented the jury from considering the issue of Clemons' intent. *See Rose*, 106 S.Ct. at 3107 n. 8; *Pope*, 107 S.Ct. at 1926 (Stevens, J., dissenting). To the contrary, evidence of Clemons' intent to intimidate Dennis was so overwhelming that the burden-shifting instruction was "simply superfluous." *Rose*, 106 S.Ct. at 3108. That Clemons threatened to beat up Dennis upon learning Dennis was a state witness against him, disproves any suggestion that Clemons intended to further the truth-seeking function of his trial. *Cf. Payne v. LeFevre*, 825 F.2d 702, 708 (2d

---

**12.** Moreover, as we noted above, defendant never raised the § 1512(c) defense until the charging conference. He made no attempt to implicate the defense during trial.

**13.** *But see Hyman v. Aiken*, 824 F.2d 1405, 1409–10 (4th Cir.1987). In *Hyman*, the court held that a *Sandstrom* burden-shifting instruction was not harmless error because there was "sub-

stantial and uncontroverted evidence" of defendant's intoxication at the time of the crime. *Id.* at 1410. Thus, the court concluded, evidence of defendant's intent was not so dispositive that it could be said beyond a reasonable doubt that the jury found it unnecessary to rely on the burden-shifting instruction. *Id.*

Cir.) (burden-shifting instruction was harmless error because no rational juror could have found that defendant "picked up his shotgun, pumped it, used it to push his apartment door open and then pulled the trigger at point blank range but did not intend to fire the shots") (citing *Rose*, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460), *cert. denied*, —— U.S. ——, 108 S.Ct. 508, 98 L.Ed.2d 506 (1987).

For these reasons, the judgment of the district court will be affirmed.