UNITED STATES of America,
Plaintiff–Appellee,

v.

Anthony GRANDISON,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Vernon EVANS, Jr.,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Rodney KELLY, Defendant–Appellant.

Nos. 88–5097(L), 88–5098 and 88–5099.

United States Court of Appeals,
Fourth Circuit.

Argued June 8, 1989.

Decided Sept. 12, 1989.

Rehearing and Rehearing In Banc
Denied Nov. 14, 1989.

Fred Warren Bennett, Federal Public Defender (Richard C.B. Woods, Baltimore, Md., Martha Rasin, Annapolis, Md., on brief), for defendant-appellants.

Juliet Ann Eurich, Asst. U.S. Atty. (Breckinridge L. Willcox, U.S. Atty., Baltimore, Md., David I. Salem, Sp. Asst. U.S. Atty., on brief), for plaintiff-appellee.

Before PHILLIPS, MURNAGHAN, and WILKINSON, Circuit Judges.

WILKINSON, Circuit Judge:

In this case we must determine if appellants established a prima facie case of purposeful discrimination in jury selection by the prosecution under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69

(1986). The district court held they did not. 721 F.Supp. 743. We affirm.

## I.

On May 27, 1983, a federal grand jury in the District of Maryland returned a two count indictment against Anthony Grandison, Vernon Evans, Jr., Janet Patricia Moore, and Rodney Kelly, charging them with conspiracy to violate civil rights resulting in death, 18 U.S.C. § 241, and witness tampering, 18 U.S.C. § 1512. Voir dire commenced on September 12, 1983, and lasted approximately three weeks. Jury selection then began on October 3, 1983.

The parties agreed that jury selection was to be conducted by a process of striking veniremen from the box. Under this procedure, twelve veniremen are seated in the jury box and the defendants and government alternate strikes. The parties can strike any of the veniremen in the box, regardless of when they are seated. As a venireman is stricken, a new potential juror is added to the box. The parties also agreed that the defendants would have seventeen peremptory challenges and the government would have ten. The defense exercised fifteen strikes and the government exercised nine. The defense exercised all but one of its strikes against white veniremen. The government struck six black veniremen. The government stated several times during selection that the jury as constituted was acceptable, and on one occasion the jury contained three black members. The jury, as finally composed, consisted of ten white and two black jurors.

Before the jury was sworn, defendants made a motion for mistrial based on the government's alleged use of peremptories to strike blacks. The district court denied the motion. On November 3, 1983, all four defendants were convicted of both charges. The convictions were affirmed on December 23, 1985. *United States v. Grandison,* 780 F.2d 425 (4th Cir.1985). Defendants Grandison, Evans, and Kelly then filed a petition for writ of certiorari to the Supreme Court.

On February 23, 1987, the Supreme Court vacated the convictions of Grandison, Evans, and Kelly, 479 U.S. 1076, 107 S.Ct. 1270, 94 L.Ed.2d 131 remanding the case to this circuit for further consideration in light of *Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), which held that *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), was to be applied retroactively. On April 8, 1987, this circuit remanded the case to the district court for further proceedings. Defendants then filed a motion for a new trial and the government filed a consolidated response.

On January 22, 1988, the district court held a hearing to determine if defendants could establish a prima facie case of purposeful discrimination by the prosecution in jury selection. On May 27, 1988, the court issued an order denying defendants' motion for a new trial and directing that the judgments be reinstated. The court concluded that the combination of facts and circumstances "reveal[ed] an inference opposite to that of racial discrimination." Because no prima facie case of discrimination was established, the court did not require the government to explain the reasons for its strikes.

Defendants appeal.

## II.

We will review at the outset the law as it relates to racial discrimination in the exercise of peremptory challenges, and the critical role of the trial judge in its implementation.

In *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court held that a defendant may make a prima facie case of purposeful racial discrimination in jury selection by showing the racially discriminatory use of peremptories by the prosecution in his case alone. To establish a prima facie case under *Batson,* a defendant must show that "he is a member of a cognizable racial group, ... and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." *Id.* 476 U.S. at 96, 106 S.Ct.

at 1723 (citation omitted). The defendant may rely on the fact that the peremptory challenges may disguise racial discrimination. *Id.* Then, "the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used [peremptory challenges] to exclude the veniremen from the petit jury on account of their race." *Id.* "Relevant circumstances" may include, but are not limited to, a pattern of peremptorily striking black jurors and the government's questions during voir dire and in exercising its challenges. *Id.* at 96–97, 106 S.Ct. at 1722–23. While *Batson* "involved a state prosecution and application of the fourteenth amendment, the same limitations are imposed on federal prosecutors by the fifth amendment." *United States v. Lane,* 866 F.2d 103, 104 n. 1 (4th Cir.1989).

If a defendant makes out a prima facie case, the burden shifts to the prosecutor to come forward with a neutral explanation for challenging black veniremen. *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723. To meet this burden of production, the explanation must relate to the particular case to be tried. *Id.* at 98, 106 S.Ct. at 1723. Of course, at all times, the defendant bears the ultimate burden of persuasion to prove the existence of purposeful discrimination. *Id.* at 93, 106 S.Ct. at 1721.

The trial judge plays a "pivotal role ... in determining a prima facie case." *United States v. Clemons,* 843 F.2d 741, 746 (3d Cir.1988). *See also Batson,* 476 U.S. at 97, 98 n. 21, 99 n. 22, 106 S.Ct. at 1723, 1724 n. 21, 1724 n. 22; *United States v. Allen,* 814 F.2d 977, 978 (4th Cir.1987); *United States v. Woods,* 812 F.2d 1483, 1487 (4th Cir.1987); *United States v. Forbes,* 816 F.2d 1006, 1010 (5th Cir.1987); *United States v. Mathews,* 803 F.2d 325, 330 (7th Cir.1986). He or she has the opportunity to observe voir dire and the prosecution's exercise of its peremptory challenges. The trial judge also has the experience "to identify a prima facie case of purposeful discrimination." *Batson,* 476 U.S. at 99 n. 22, 106 S.Ct. at 1724 n. 22. As in the Title VII context, moreover, a trial judge's " 'finding of intentional discrimina-

tion is a finding of fact,' " *id.* at 98 n. 21, 106 S.Ct. at 1724 n. 21, *quoting Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985), which turns largely "on evaluation of credibility." *Batson,* 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21. Such findings are entitled to "great deference," *id.,* and "will not be disturbed by this court unless clearly erroneous." *Lane,* 866 F.2d at 105; *United States v. Tindle,* 860 F.2d 125, 129 (4th Cir.1988); *United States v. Hamilton,* 850 F.2d 1038, 1040 (4th Cir.1988); *Woods,* 812 F.2d at 1487; *Mathews,* 803 F.2d at 330.

The circumstances of this case illustrate why deference to district courts is so appropriate in this context. Here, the trial court was intimately familiar with the selection of the jury. It conducted individual voir dire in its chambers, asking each potential juror the same series of questions. Following this initial questioning, it asked follow-up questions of the potential jurors prepared by the parties. After all questioning had been completed, the court heard argument and ruled on the parties' motions to strike jurors for cause. Finally, it observed the parties' use of their peremptory challenges.

Thus, the district court's findings stemmed from first-hand knowledge and observation of the critical events. The fact-finder was in an even more advantageous position, vis-a-vis an appellate court, than in a Title VII case, where substantial deference to factual determinations on discrimination is routinely accorded. In assessing appellants' prima facie case, the district court relied on its "memory of" voir dire as well as its "evaluation of credibility." *Batson,* 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21. The court, as *Batson* requires, analyzed all facts and circumstances surrounding the case to determine if they created an inference that government counsel intentionally and purposefully struck potential jurors solely because they were black.

### III.

Appellants contend that the facts of this case support an inference of racial discrimi-

nation. We, however, affirm the finding of the trial court to the contrary.

■ No per se rule exists to establish a prima facie case of purposeful discrimination. *Lane*, 866 F.2d at 107; *United States v. Sanqineto–Miranda*, 859 F.2d 1501, 1521 (6th Cir.1988); *United States v. Montgomery*, 819 F.2d 847, 851 (8th Cir. 1987); *Clemons*, 843 F.2d at 746. *But see United States v. Chalan*, 812 F.2d 1302, 1314 (10th Cir.1987). Nor does a prosecutorial checklist exist to avoid the inference of discriminatory practices. "The Supreme Court's mandate in *Batson* to consider all the facts and circumstances means that we cannot lay down clear rules as to [what] ... will constitute or refute a prima facie case." *Sanqineto–Miranda*, 859 F.2d at 1521.

■ While the racial composition of the actual petit jury is not dispositive of a *Batson* challenge, neither was the district court precluded from considering it. Here two of the twelve petit jurors were black. Although the presence of minorities on the jury does not mean that a *Batson* prima facie case cannot be made, *Lane*, 866 F.2d at 105; *Clemons*, 843 F.2d at 747; *United States v. Cartlidge*, 808 F.2d 1064, 1070 (5th Cir.1987); *Fleming v. Kemp*, 794 F.2d 1478, 1483 (11th Cir.1986), the fact the jury included two black jurors is significant. *See Lane*, 866 F.2d at 106; *Montgomery*, 819 F.2d at 851; *United States v. Williams*, 822 F.2d 512, 515 (5th Cir.1987); *United States v. Dennis*, 804 F.2d 1208, 1211 (11th Cir.1986). This is especially so where, as here, the government could have used a remaining strike against those jurors but three times declined to do so. *See Lane*, 866 F.2d at 106; *Saqineto–Miranda*, 859 F.2d at 1522; *Woods*, 812 F.2d at 1487; *Williams*, 822 F.2d at 515; *Montgomery*, 819 F.2d at 851; *Dennis*, 804 F.2d at 1210–11.

The government's consideration of each potential juror further supports the district court's conclusion. *See Batson*, 476 U.S. at 97, 106 S.Ct. at 1723; *Lane*, 866 F.2d at 107; *Clemons*, 843 F.2d at 748; *Mathews*, 803 F.2d at 332. As the district court recognized, both its "memory of the events" and its "review of ... sections of the voir dire transcript" indicated that "counsel for the government considered each potential juror carefully and thoughtfully." If the prosecution felt that race might be an issue in its peremptory strikes, it raised that concern with the court and opposing counsel and requested the court to inquire further. Moreover, as the district court added, the government did not exhibit "any of the desultory or half-hearted questioning which can indicate the government's intent to strike black people regardless of their answers."

■ Appellants' contention that the government did not carefully consider each venireman because it did not present "meaningful" follow-up questions to at least four of the stricken black veniremen is without merit. We refuse to require the government to ask follow-up questions to every stricken venireman during voir dire in order to defeat a *Batson* challenge. A balance must be struck between fair jury selection procedures and the need to move promptly toward trial. The decision not to ask follow-up questions is a matter of trial strategy; failure to do so is not dispositive of the thoughtfulness of the prosecution's exercise of its peremptory strikes. Indeed, no genuine need for follow-up questions may exist. Here, in fact, the government was already familiar with every potential juror. Each individual had responded to general questions, appeared in chambers for individual questioning, and completed a questionnaire.

■ Three additional facts support the district court's conclusion. First, the government accepted, during the selection process, a jury that included three black jurors. Appellants argue that this should not be considered because after the government passed on a jury with three black members, the government exercised a peremptory challenge against a black juror it had earlier accepted. We disagree. The point is that had the defendants accepted the jury as the government did, the jury would have included three black members.

Second, the government did not exercise its strikes in any particular pattern. *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723; *Lane*, 866 F.2d at 107; *Sanqineto–Miranda*, 859 F.2d at 1522; *Clemons*, 843 F.2d at 748; *Mathews*, 803 F.2d at 332. The government struck three white veniremen and six black veniremen. The government's second, fifth, and sixth strikes were against white veniremen, and its first, third, fourth, seventh, eighth, and ninth strikes were exercised against black veniremen. It did not strike black veniremen consecutively, *Lane*, 866 F.2d at 107, nor did it strike black veniremen in such a fashion so as to assure that no more than two blacks served on the jury.

Finally, the government did not exercise any strikes during the selection of six alternates, three of whom were black. The alternates were important. The jury was to be sequestered and the trial was expected to last at least four weeks. Both parties had every expectation that some of the alternates would end up on the main jury panel. The fact that no alternates actually served does not undercut the fact that the government agreed to three black alternates whose prospects of serving were substantial.

■ Appellants contend that statistical analysis supports an inference of purposeful discrimination. They argue that while the jury pool began with a greater representation of blacks (27.45%) than exists in the Maryland population (22.7%), the government's use of peremptory challenges reduced black representation to 16.67% on the petit jury. Such a reduction, they assert, "cut[s] in favor of a *prima facie* showing of purposeful discrimination."

We disagree. To begin with, appellants' statistical analysis falls of its own weight. First, the government accepted a jury with three black members, or 25% black representation, in excess of the state average. Additionally, although only two of the twelve petit jurors were black, three of six alternates were black. When the alternates are included in the statistical analysis, then five out of eighteen jurors were black, for a black representation of 27.7%, a figure which again exceeds the state average.

Such statistical comparisons are, however, a poor way to resolve a *Batson* challenge. While several courts have employed statistical analysis as one factor in determining whether a *Batson* prima facie case exists, *Sanqineto–Miranda*, 859 F.2d at 1521–22; *Williams*, 822 F.2d at 515, the Sixth Amendment does not require that the " 'petit juries actually chosen ... mirror the community and reflect the various distinctive groups in the population.' " *Batson*, 476 U.S. at 85–86 n. 6, 106 S.Ct. at 1717 n. 6, *quoting Taylor v. Louisiana*, 419 U.S. 522, 538, 95 S.Ct. 692, 701, 42 L.Ed.2d 690 (1975). *See also Clemons*, 843 F.2d at 746; *Montgomery*, 819 F.2d at 851. As the *Batson* Court recognized, "it would be impossible to apply a concept of proportional representation to the petit jury in view of the heterogeneous nature of our society." *Batson*, 476 U.S. at 86 n. 6, 106 S.Ct. at 1717 n. 6. The striking of a single venireman for racial reasons is not to be countenanced, even if the final minority composition of the entire jury were to exceed the state or community average. Similarly, the fact that the statistical balance of the petit jury fails to reflect some general population percentage is no proof that the prosecution has impermissibly exercised its challenges. The defendant's constitutional right is not to a specified percentage of minority jurors, but to a process in which the state considers prospective jurors wholly independent of their race. A battle of the numbers on appeal is no substitute for the district court's assessment of the conduct of the government at trial.

■ Appellants contend finally that the fact both the victims in this case and many of the witnesses were white suggests that the government would have reason to want few black jurors, raising an inference of discriminatory purpose. Appellants argue that the obvious racial overtones of this case are underscored by a letter, admitted into evidence, in which Grandison referred to an intended victim as a "white bitch."

Appellants' contentions are factually suspect. Of the more than thirty witnesses

called, fourteen were black. Many of the principal government witnesses were black, and much of the government's primary evidence was introduced through them. The fact that many of the important witnesses were black "discount[s] any advantage that a discriminating prosecutor might perceive in striking blacks from the jury." *Mathews*, 803 F.2d at 332; *Williams*, 822 F.2d at 516.

More fundamentally, to infer prosecutorial discrimination because of the race of government witnesses has serious implications. To a considerable extent, any party is forced to take its witnesses as it finds them. Much the same is true of other evidence; the government was not remiss in introducing the letter in Grandison's own handwriting, which operated as an advance confession to the crime for which he was charged. We do not think it proper to discourage prosecutors from calling relevant witnesses and introducing relevant evidence for fear it may compromise their defense to a *Batson* challenge. This trial concerned the killing of two federal witnesses; the victims and defendants could have been of any race or national origin, and the issues would have been no different. Absent some evidence that the prosecution has taken the racial identities of the victims or witnesses into account in jury selection, we decline to indulge in speculation about its incentive to do so.

### IV.

A prima facie case of discrimination does not arise "every time a prosecutor strikes a black prospective juror." *Lane*, 866 F.2d at 105. Numerous valid factors may influence a prosecutor to strike a particular potential juror, including "current and past employment, general appearance and demeanor, previous jury service, and the absence or presence of apparent prejudice." *Id.* at 106. While prosecutors may not challenge prospective jurors because of their race, they may exercise their peremptory challenges " 'for any reason at all, as long as that reason is related to [their] view concerning the outcome' of the case to be tried." *Batson*, 476 U.S. at 89, 106 S.Ct. at 1719, *quoting United States v. Robinson*, 421 F.Supp. 467, 473 (D.Conn.1976), *mandamus granted sub. nom. United States v. Newman*, 549 F.2d 240 (2d Cir. 1977). Peremptory challenges have long been exercised to ensure both parties the existence of a fair and impartial jury; the usefulness of this device could be undermined by restrictive appellate rule-making. The trial court found no supportable inference of discrimination in this case and we affirm its judgment.

AFFIRMED.

MURNAGHAN, Circuit Judge, dissenting:

Disproportionate striking of jury men or women on racial grounds cannot be excused or ignored because the offense was heinous. Conviction should be affirmed only if correctly achieved.[1] Otherwise the foundations of our criminal jurisprudence would be in substantial disarray.

It, therefore, is of no importance and irrelevant, for present purposes, what the jury, which may have been improperly selected, found as crimes, however outrageous, that Anthony Grandison *et al* were responsible for. It is imperative to ascertain whether the jury should have been allowed, as constituted, to have sat in judgment at all.

With the number of peremptory strikes of black members of the venire disproportionate when measured against almost any criteria, it becomes incumbent upon the prosecution to justify its strikes as not racially motivated. The prosecutors may well succeed in doing so. No doubt they feel they can. But "maybe" is not "is". If they cannot do so, the convictions should not stand. It is not too much to require satisfactory proof instead of mere sur-

---

1. Harmlessness of error, which is used on rare occasion to uphold a conviction, is not available here. Racial discrimination, with the outrageous impression it establishes for anyone subjected to it, and its message of exclusion from a just society of one so mistreated, render any error due to it harmful.

mise[2] when the case of possible racial discrimination is as starkly present as it is here. The result of proof of discrimination, after all, would lead merely to retrial by a properly selected jury, not to exoneration.

The burden on the government, after all, is not great. Recognizing the established role of peremptory jury strikes in our criminal system, but also recognizing that jury selection is a process particularly susceptible to discrimination "by those who are of a mind to discriminate," *Batson v. Kentucky*, 476 U.S. 79, 96, 106 S.Ct. 1712, 1723, 90 L.Ed.2d 69 (1986) (quoting *Avery v. Georgia*, 345 U.S. 559, 562, 73 S.Ct. 891, 892, 97 L.Ed. 1244 (1953)), the Supreme Court has delineated a simple process by which, upon a *prima facie* showing of racially discriminatory jury selection, the burden shifts to the government to offer a racially neutral explanation for challenging jurors of the given racial group.

Of course, the trial judge is in a unique position to evaluate any *prima facie* claim. Indeed, the district court and majority opinions are well-reasoned and certainly persuasive on this score. But both reflect a confusion over the court's proper role at each stage of the *Batson* proceeding. We need not measure the defendant's *prima facie* case against the evidentiary burden ultimately required to prove intentional discriminatory strikes. The real question presented is the quantum of evidence necessary to support a *prima facie Batson* showing—an *inference* that even one peremptory strike was utilized to exclude a member of a cognizable racial group from the venire.

As the majority acknowledges, case law in this rapidly developing area is very fact specific and appellate courts have been reluctant to lay down any bright line test or *per se* rules. *United States v. Sanqineto–Miranda*, 859 F.2d 1501, 1521 (6th Cir. 1988). While a district court finding as to a *prima facie* case may be entitled to "deference," *see United States v. Lane*, 866 F.2d 103 (4th Cir.1989), the great weight of authority cited by the majority gives little guidance.[3] Generally, however, a *prima facie* case is exactly that, *prima facie*. It is *not* an explicit finding of intentional discrimination, that would ordinarily be entitled to greater deference on appeal. *See Anderson v. Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Operating under the dire spectre of invidious racial discrimination, such a *prima facie* showing should merely require a compilation of facts capable of raising a suspicion sufficient enough to trigger the relatively painless remedial measure prescribed by *Batson*—a sufficient proffer by the government of a racially neutral explanation for the given action. The subsequent factual determinations of lack of pretext or intentional discrimination are fully within the trial court's prerogative as factfinder, and are just as fully entitled to great deference on appeal. Here, the district court opinion reads as a sound and thorough discussion under, say, a sufficiency of the evidence analysis. It ignores, however, the facially suspect nature of the government's

**2.** If whether a door was locked was pertinent, it would be preferable to go and see than merely to assume that users of the door following use regularly turned the key.

**3.** For example, many of the cases cited by the majority involve a district court determination conducted *after* a *prima facie* defense showing and an assessment of the government's explanation. *See, e.g., United States v. Tindle*, 860 F.2d 125, 129 (4th Cir.1988), *cert. denied,* — U.S. ——, 109 S.Ct. 3176, 104 L.Ed.2d 1038 (1989); *United States v. Hamilton,* 850 F.2d 1038, 1040–41 (4th Cir.1988), *cert. denied,* — U.S. ——, 109 S.Ct. 1564, 103 L.Ed.2d 931 (1989); *United States v. Woods,* 812 F.2d 1483, 1487 (4th Cir. 1987) ("Since the United States Attorney made a showing of his reasons for the exercise of his

challenges, we may examine those reasons under *Batson* and we may leave for another day the question of whether the defendant made out a prima facie case.") In *United States v. Lane,* 866 F.2d 103 (4th Cir.1989), we found the defendant had failed to meet his *prima facie* burden where the sole evidence he produced was that the prosecution struck a member of his racial group. Considerably more evidence suggesting a discriminatory motive is before us today. *See United States v. Mitchell,* 877 F.2d 294 (4th Cir. 1989) (*prima facie* case established where prosecutor used seven of ten peremptory strikes against black veniremen and previous jury panel had to be dismissed because of racially inflammatory remark made in juror's lounge).

action within a context inherently susceptible to abuse, the broad remedial purpose of *Batson,* and the consequently lower evidentiary threshold necessary to trigger the simple government burden of producing a racially neutral explanation. It calls on the government for no explanation whatsoever.

Yet such an explanation is called for here. The spectre of racial discrimination is clearly apparent. Six of the nine strikes employed by the government were used against blacks.[4] The disparate nature of that fact is emphasized by the consideration, trumpeted by the prosecution, that two or three black jurors remained. Percentagewise blacks were still significantly underrepresented.

A predominant number of the government witnesses at the trial were white, including, in particular, the main identification witness. A letter written by Grandison, which was a prominent part, indeed a cornerstone, of the government's case, referred to one of the intended victims of a cruel and wanton murder as a "white bitch," making race a matter of heightened importance by emphasizing a legal irrelevance more likely to repel white jurors than it would blacks.

The fifty-one possible jurors remaining after the parties excused a number by agreement amounted to 27.45% black. Peremptory challenges reduced black representation to 19%. The Maryland black population in the 1980 census was 22.7%. The main jury panel, after the government's peremptory challenges, consisted for Grandison *et al* of 3 blacks out of a total of 30, or 10%.

In light of those facts, the case of *prima facie* discrimination, not arduous to establish and correspondingly not difficult to dispel,[5] should have to be rebutted. Since the prosecution was excused from even

---

**4.** In addition, one of the three whites peremptorily struck by the prosecution was the wife of a black.

**5.** As stated, rebuttal of a *prima facie* case of racial discrimination is not difficult if reasonable grounds are adduced. Leaving the ques-

having to approach the issue, I respectfully dissent.

---

tion totally unanswered, in the presence of factors suggesting more than a tinge of racial prejudice, contributes precisely to the appearance of injustice that *Batson* was in large measure designed to prevent.