UNPUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

NADINE Y. THIGPEN, individually and
as personal representative of the
Estate of Rahsaun Richardson also
known as Rahsaun Richardson,
Plaintiff-Appellant,

v.

No. 96-1335

MARY SHIELDS, individually and as
an officer of the Prince George's
County Police Department; PRINCE
GEORGE'S COUNTY, MARYLAND;
DAVID B. MITCHELL, Chief,
Defendants-Appellees.

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, District Judge.
(CA-94-827-PJM)

Argued: March 7, 1997

Decided: April 11, 1997

Before WILLIAMS, MICHAEL, and MOTZ, Circuit Judges.

_____

Affirmed in part and remanded in part by unpublished per curiam
opinion. Judge Williams wrote an opinion concurring in part and dis-
senting in part.

_____

**COUNSEL**

**ARGUED:** Fred R. Joseph, JOSEPH, GREENWALD & LAAKE,
P.A., Greenbelt, Maryland, for Appellant. Jay Heyward Creech,

Upper Marlboro, Maryland, for Appellees. **ON BRIEF:** Sean D. Wallace, Upper Marlboro, Maryland, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

The mother of a juvenile, whom a police officer fatally shot while attempting to arrest him, brought this excessive force action against the officer. A jury found for the police officer. The mother appeals, challenging several evidentiary rulings, a jury instruction, and the district court's denial of her Batson v. Kentucky , 476 U.S. 79 (1986), challenge. We find no reversible error in the evidentiary determinations or jury instruction but because we are unable to determine the basis for the district court's Batson ruling, we remand for further proceedings with respect to that issue.

I.

In the early morning hours of February 25, 1991, Rahsaun Richardson and Melvin Berry stole a vehicle, drove to the Andrew Jackson Middle School, entered the library, and began removing computer equipment.

Their activity apparently tripped an internal alarm. In response, at approximately 3 a.m., Cpl. Mary Shields, an officer of the Prince George's County Police Department, and her police dog were dispatched to the school. Cpl. Shields twice announced her presence and warned persons inside the school to surrender or the police dog would be released to locate them. When there was no response, she released the dog into the school and followed it.

Upon hearing the police arrive, Richardson and Berry ran to the auditorium/cafeteria area and searched for a place to hide. The dog

2

initially led Cpl. Shields to the library and after securing that location, she continued the search. In the auditorium/cafeteria area, the dog indicated the scent of people and Cpl. Shields located and apprehended Richardson and Berry. Because Berry would not follow instructions and appeared to be preparing to flee, the dog was placed on him for restraint. Richardson's mother, Nadine Y. Thigpen, asserts that the dog also attacked Richardson for no reason and that both boys began to cry.

After this confrontation, Cpl. Shields directed Richardson and Berry to walk toward the outside door through which they had entered the building. They began walking together in front of her and the dog. However, Richardson stopped, assertedly because he had been bitten and was having difficulty walking. Cpl. Shields believed he was trying to get behind her, which would have put her between the two suspects where she might be overpowered. Accordingly, Cpl. Shields ordered Richardson to keep moving; he did not comply. The officer eventually ordered the dog to bite Richardson to prevent him from moving behind her.

In response, Richardson threw the dog, by the neck, into a locker. When Cpl. Shields checked on the dog, Richardson hit her on the head. She tried to grab and control Richardson but he continued striking her on the head. She began to lose consciousness and next remembered a flash and loud noise waking her. The flash and noise were her gun discharging; she shot Richardson in the leg.

Richardson either grabbed or looked at his leg and then began to swing towards the officer's head with a chain. Cpl. Shields backed up and fired again at Richardson, this time hitting him in the upper back; the second shot was fatal. Richardson slumped down backwards and the officer called for assistance.

Ms. Thigpen, as personal representative for Richardson's estate and in her own capacity, initiated this action against Cpl. Shields, Police Chief David B. Mitchell, and Prince George's County. The complaint alleged an excessive force civil rights claim pursuant to 42 U.S.C. § 1983 and various state law claims, and sought compensatory and punitive damages. Following a bifurcated trial, the jury found for Cpl.

Shields on all counts; the district court entered judgment for all defendants eleven days later. Ms. Thigpen appeals.

II.

Ms. Thigpen, an African-American, initially claims that the district court erred in denying her Batson challenge. After Cpl. Shields struck from the jury panel two African-American women and a man who was not identified as from a cognizable racial group, Ms. Thigpen protested on Batson grounds. At first, she claimed all three strikes were of African-Americans, but the district court quickly clarified that only two of the three struck jurors were African-Americans and then noted that one African-American man had been seated with the jury that had been selected.

Without assessing whether Ms. Thigpen had made a prima facie case, the court immediately asked counsel for Cpl. Shields if he wanted "to state any sort of reason for the strikes, of the two [they] struck." The following colloquy ensued:

> [DEFENSE COUNSEL]: Your Honor, I'll state reasons, but I think that for two out of the three, I don't think they've stated what their prima facie. As to juror number 1676 . . . Miss Shields indicated that she was staring at her the entire time.
>
> Additionally, I was concerned over the fact that, you know, she lived in the county, so that's the reason why we struck.
>
> THE COURT: She lived where?
>
> [DEFENSE COUNSEL]: The town of Camp Springs. Of course, in my mind, being from Prince George's County, they're exposed to much more negative publicity from both.
>
> THE COURT: What about the other people? You've got [a seated juror], who's also from the same town, Camp Springs.

4

[DEFENSE COUNSEL]: But she wasn't staring at my client.

THE COURT: What about the other?

[DEFENSE COUNSEL]: Miss Meredith appeared to look throughout the course of the proceedings, only time I've seen her look up, she's looked right over to Miss Thigpen during the course of this, and that is the basis that I struck her.

It also appears she's approximately the age of Miss Thigpen, and I feel there may be some identity there. . . .

THE COURT: All right.

[MS. THIGPEN'S COUNSEL]: Our position is that, number one, obviously, the fact that Miss Pipkin lives in the county is not an adequate basis, and it's contradicted by the other decision.

To say that this individual was staring at his client, Miss Shields, I think is perhaps stretching Batson even beyond its limits.

Karen Meredith, 1728, did not respond to any questions, to the best of my knowledge, and once to say that she looked over to the plaintiff's table, and [defense counsel] was concerned about bonding due to the same age, the number of women that were selected are the same age, and I don't think that that's a valid basis for him to strike.

The court then ruled:

THE COURT: Well, I don't think that there's a prima facie case here, because I think one African male has been seated, so although the reasons may be a bit extraneous as far as defendant is concerned, I don't think there's a prima facie case in any event.

5

>    The reasons don't have to be too -- too rational, but I
>    can't, prima facie is necessarily raised. I'm going to deny
>    the motion.

The Batson analysis proceeds in three steps. First, the party chal-
lenging the strikes must establish a prima facie case of discriminatory
use of peremptory challenges by demonstrating that she "is a member
of a cognizable racial group, . . . and that the[opposing party] has
exercised peremptory challenges to remove from the venire members
of the defendant's race." United States v. Grandison, 885 F.2d 143,
145 (4th Cir. 1989), cert. denied, 495 U.S. 934 (1990) (quoting
Batson at 96). In determining whether a prima facie case has been
established, a court can consider all relevant circumstances including
but not limited to the pattern of strikes, and questions and statements
during voir dire. Id. at 146. Second, if the moving party establishes
a prima facie case, the striking party must provide non-discriminatory
bases for the challenged peremptory challenges. Id. Third, if the strik-
ing party states a non-discriminatory basis for its use of peremptories
then the moving party must provide proof of discriminatory selection
despite the neutral reasons advanced. Batson, 476 U.S. at 96-98.

We defer to the district court in the context of a Batson challenge
because it has observed the voir dire and the exercise of peremptory
strikes. Grandison, 885 F.2d at 146. Furthermore, we "will not exam-
ine whether the defendant has met his burden in establishing a prima
facie case where the prosecutor articulates [legitimate] reasons for
[the] strikes." United States v. McMillon, 14 F.3d 948, 952 (4th Cir.
1994) (citing United States v. Lane, 866 F.2d 103, 105 (4th Cir.
1989); United States v. Joe, 928 F.2d 99, 103 (4th Cir. 1991), cert.
denied, 502 U.S. 816 (1991)).

When the district court jumps immediately to the second step in the
Batson analysis -- ascertaining that the reasons for the strikes are
legitimate -- we will affirm if we agree that those reasons are ade-
quate. See McMillon, 14 F.3d at 953. Hence, the fact that here the dis-
trict court proceeded immediately to the second step, in and of itself,
provides no basis for remand or reversal. But in this case the court
never completed its analysis under the second step-- it never deter-
mined whether the reasons for the challenged strikes were legitimate.
Indeed, to the extent the district court assessed those reasons the court

6

indicated some doubt as to their legitimacy, noting "the reasons may be a bit extraneous as far as defendant is concerned."

Accordingly, we can affirm on this record only if the record supports the district court's ultimate determination that Ms. Thigpen had not established a prima facie case. Unfortunately, it does not. The court's entire explanation for its ruling was: "I don't think that there's a prima facie case here, because I think one African male has been seated." Clearly "[t]he composition of the jury may be considered as part of the total relevant circumstances upon which a determination of discrimination in jury selection is made," however, just as clearly, this factor "is not dispositive of that issue ." Joe, 928 F.2d at 103 (emphasis added); see also Grandison, 885 F.2d at 147. Yet the record does not indicate any other basis for finding that Ms. Thigpen failed to establish a prima facie case.

Accordingly, we simply cannot determine whether the district court applied the correct legal analysis in determining that Ms. Thigpen had not established a prima facie case. When an appellate court cannot ascertain whether the trial judge "applied the proper legal analysis" in its Batson ruling, the appropriate course is to remand "for further proceedings in order for the district court to clarify its ruling." Jones v. Plaster, 57 F.3d 417, 421-422 (4th Cir. 1995) (remanding a Batson challenge because we could not discern "whether the district court applied the proper legal analysis in reaching its decision to overrule [the moving party's] objection.")

As in Jones, we note that "this ruling need not be elaborate." 57 F.3d at 422. Rather, the district court need only articulate why it found Ms. Thigpen had failed to establish a prima facie case.

III.

Ms. Thigpen's remaining arguments are meritless. Most are evidentiary challenges. The district court's decision to admit or exclude evidence is discretionary and will not be overturned unless it is "arbitrary or irrational." United States v. Powers , 59 F.3d 1460, 1464 (4th Cir. 1995), cert. denied, 116 S. Ct. 784 (1996).

7

A.

The first evidentiary challenge is to the district court's decision to exclude evidence of prior shootings by Cpl. Shields. Evidence of prior bad acts, so long as it is relevant, is permitted for any purpose other than to demonstrate the defendant's propensity to commit unlawful acts. Id. However, even relevant evidence may be properly excluded if the trial judge believes that "there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence." Id. at 1467 (quoting Masters , 622 F.2d 83, 87 (1983)). In the instant case, the district court excluded the evidence concerning prior shootings by Cpl. Shields, one of which resulted in a verdict in excess of one million dollars against her, finding that even if marginally relevant, this evidence was confusing and unnecessarily prejudicial.

Relying on Powers, Masters, and United States v. Percy, 765 F.2d 1199 (4th Cir. 1985), Ms. Thigpen maintains that this evidence should have been admitted because it "complete[s] the story of the offense," Powers, 59 F.2d at 1466, or shows a pattern of bad acts. Percy, 765 F.2d at 1203. However, Powers and Masters involved several transactions (firearms trading in Masters) or incidents (beatings in Powers) that concern the same (or intricately related) parties or that, taken together, comprise the res gestae of the act of which defendant was accused. Thus, in those cases the questioned evidence did complete the story of the offense. In contrast, here the shootings occurred years apart from one another. Moreover, unlike Percy , there is no evidence of any pattern, or indeed of any similarities between them.

At best, Ms. Thigpen has only demonstrated that the district court would not have erred if it had admitted the evidence of prior shootings. She has utterly failed to demonstrate that the district court abused its discretion in excluding this evidence.

B.

Ms. Thigpen argues that the district court erred in excluding photographs and medical records of Melvin Berry, her son's accomplice. She relies primarily upon Schultz v. Butcher, 24 F.3d 626, 632 (4th Cir. 1994), in which we held that excluding evidence of a captain's

8

drunkenness totally deprived a co-defendant from advancing a theory that the drunkenness of the captain caused the accident.

Schultz involved evidence excluded at a bench trial. To the extent it is relevant in determining whether evidence was properly excluded as unfairly prejudicial at a jury trial, it is distinguishable. Here, in contrast to Schultz, the district court did not exclude all evidence on the subject. Rather, the court expressly allowed testimony about Berry's injuries; it simply denied admission of the photographs and records finding them "unfairly prejudicial" because their only purpose was to "embellish" testimony. Thus, Ms. Thigpen, unlike the co-defendant in Schultz, was not prevented from developing her theory of the case. There was no error.

C.

Next, Ms. Thigpen claims that the district court erred in admitting extrinsic evidence of Berry's prior inconsistent statements because Berry conceded on cross examination that he had made the statements and because these statements assertedly involve collateral matters.

For this argument, she principally relies on United States v. Ince, 21 F.3d 576 (4th Cir. 1994). In Ince, a prosecutor introduced a prior inconsistent statement to impeach his own witness. We noted that when the prosecution attempts to impeach its own witness, the "prejudicial impact often substantially outweighs its probative value for impeachment purposes because the jury may ignore the judge's limiting instructions and consider the `impeachment' testimony for substantive purposes." Id. at 581. We held that the prior inconsistent statement was inadmissible because it had no impact upon the witness's credibility. Id.

Unlike the prosecutor in Ince, counsel for Cpl. Shields did not attempt to impeach his own witness with the prior statement. Moreover, the district court found that portions of the statement greatly affected the witness's credibility and therefore permitted those portions -- and only those portions -- to be admitted into evidence. The district court also offered to give the jury a limiting instruction on the use of the written statement. Under these circumstances, there was no abuse of discretion in admitting the statements.

9

D.

Ms. Thigpen asserts that the district court erred in admitting evidence of the retirement of the police dog following this incident.

At trial, Ms. Thigpen proposed reading part of Cpl. Shields' deposition to the jury. Specifically, she wanted to read a question posed to Cpl. Shields in which the officer was asked if the dog was "injured physically" and responded: "I don't think they found anything like a broken bone or anything like that, but I think emotionally she suffered a shot." Ms. Thigpen wanted to omit the follow-up question and answer in which Cpl. Shields explained that the dog had been retired. Ms. Thigpen argued that this information was irrelevant and would cause the jury to feel sympathy for Cpl. Shields.

The court ruled that all of the questions were admissible. Following this ruling, Ms. Thigpen suggested that the court entirely eliminate questions about the dog's injuries. When the court responded that because "[t]he three of them were mixing it up at some point, whether . . . the dog was injured would be relevant." Ms. Thigpen agreed, but again objected to the discussion about the dog's retirement.

Clearly, Ms. Thigpen considered the dog's injuries to be suspect and wanted to introduce evidence to this effect. Her reason for proffering Cpl. Shields' deposition statement, that the dog didn't have "a broken bone or anything like that," was to call into question whether the dog had actually been injured. For this reason, the follow-up question about the dog's retirement was relevant, and the district court did not err.

IV.

Finally, Ms. Thigpen claims that the district court erred in prohibiting her from arguing an intentional deprivation of rights theory to the jury. Evidence of either "reckless or callous disregard for the plaintiff's rights" or "intentional violations of federal law" is sufficient to present a jury issue as to punitive damages in a§ 1983 action. Smith v. Wade, 461 U.S. 30, 50 (1983). Therefore, the district court should have permitted Ms. Thigpen to argue both standards to the jury.

10

Its failure to do so is harmless because the district court instructed the jury on the lesser standard -- callous indifference -- thereby eliminating any concern that requiring Ms. Thigpen to meet the higher standard did not adequately vindicate the"legitimate interests in punishing unlawful conduct and deterring its repetition." BMW of North America, Inc. v. Gore, 116 S.Ct. 1589, 1595 (1996). See also Smith, 461 U.S. at 54 (1983). Furthermore, the jury did not find Cpl. Shields liable, thereby foreclosing it from awarding punitive damages under any standard. See Gore, 116 S.Ct. at 1597-98.

V.

For all of these reasons, the judgment of the district court is

AFFIRMED IN PART AND REMANDED IN PART.

WILLIAMS, Circuit Judge, concurring in part and dissenting in part:

Although I concur in Sections I, III, IV, and V of the Majority's opinion, I write separately to express my disagreement with Section II. In my view, the district court quite clearly ruled that, in raising her challenge under Batson v. Kentucky, 476 U.S. 79 (1986), Thigpen failed to make out a prima facie case. Moreover, I agree with the district court's conclusion. Shields used two of her three peremptory strikes to remove black jurors, while one black juror -- who could have been stricken with the final strike -- was seated. There is no other evidence from the voir dire to support an inference of discrimination. It is true that the seating of one black juror "is not dispositive of" the Batson challenge, United States v. Joe, 928 F.2d 99, 103 (4th Cir. 1991), but here it strongly undercuts the already attenuated statistical showing by Thigpen. In the absence of any evidence beyond such a limited statistical argument, I would affirm the district court's rejection of Thigpen's Batson challenge.

In any event, even assuming that Thigpen made out a prima facie case, Shields has unquestionably discharged her burden to articulate "legitimate" reasons for the strike. "The second step of [a Batson inquiry] does not demand an explanation that is persuasive, or even plausible." Purkett v. Elem, 115 S. Ct. 1769, 1771 (1995). Rather,

11

"`[a]t this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'" Id. (quoting Hernandez v. New York, 500 U.S. 352, 360 (1991) (plurality opinion)) (alteration in original). Therefore, no matter how "extraneous," Shields' explanation is nonetheless valid unless inherently discriminatory. Here, the offered reasons -- hinging on each juror's conduct -- were not inherently discriminatory. I therefore disagree with any suggestion that Shields did not satisfy her burden during the second step of the Batson inquiry.

12