**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 10-5026**

———————————

UNITED STATES OF AMERICA,

               Plaintiff - Appellee,

    v.

JOHN FITZGERALD LEGRAND,

               Defendant - Appellant.

———————————

Appeal from the United States District Court for the District of
Maryland, at Baltimore.    Catherine C. Blake, District Judge.
(1:10-cr-00052-CCB-1)

———————————

Argued:  May 15, 2012              Decided:  June 8, 2012

———————————

Before GREGORY, DUNCAN and DIAZ, Circuit Judges.

———————————

Affirmed by unpublished opinion.  Judge Duncan wrote the
opinion, in which Judge Gregory and Judge Diaz concurred.

———————————

**ARGUED:** Ray M. Shepard, SMITH, GILDEA & SCHMIDT, LLC, Towson,
Maryland, for Appellant.  Paul E. Budlow, OFFICE OF THE UNITED
STATES ATTORNEY, Baltimore, Maryland, for Appellee.  **ON BRIEF:**
Rod J. Rosenstein, United States Attorney, Harry M. Gruber,
Assistant United States Attorney, OFFICE OF THE UNITED STATES
ATTORNEY, Baltimore, Maryland, for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit.

DUNCAN, Circuit Judge:

A jury convicted John Legrand on all eleven counts for which he was indicted arising from three armed robberies in Maryland and Pennsylvania. These counts included conspiracy, robbery, possession of a firearm in furtherance of a crime of violence, being a felon in possession of a firearm, witness tampering, obstruction of justice, and witness retaliation, in violation of 18 U.S.C. §§ 1951, 924(c), 922(g), 1512(c), 1513, and 1512(b), respectively. On appeal, Legrand argues that multiple constitutional violations tainted his convictions, and thus asks that we vacate them and order a new trial. For the reasons that follow, we reject Legrand's challenges and affirm.

I.

We set forth the facts relevant to the issues on appeal in roughly chronological order. We begin by describing the events and investigation that led to Legrand's arrest and indictment. We then proceed to describe relevant pretrial proceedings. Finally, we detail the relevant evidence introduced against Legrand at trial.

A.

The three armed robberies at the heart of this case took place over ten days in January 2008. On January 12, two

assailants robbed a gas station on Belair Road in Baltimore, Maryland. On January 21, a single assailant robbed a Pizza Hut in Dover, Pennsylvania. On January 23, a single assailant robbed a Burger King on Pulaski Highway, outside of Baltimore.

After Officer Joseph Ruth responded promptly to the robbery of the Burger King, a witness described the assailant and directed Ruth to the street where the person had last been seen. Upon reaching the street, Ruth observed a man matching the description enter the front passenger seat of a Jeep Liberty. Ruth approached the Jeep Liberty and turned on his cruiser's emergency lights. At this point, the driver took off, and a high-speed chase ensued. Ruth was eventually able to stop the vehicle and arrest the driver, but was unable to apprehend the passenger, who fled on foot.

Police identified the driver as Errol Fulford, Legrand's nephew. Police also identified the owner of the Jeep Liberty as Martha Talley, Legrand's mother. Talley informed officers that she had lent her vehicle to Legrand. Upon processing the vehicle, police discovered fingerprints on a bottle inside the car and on its front passenger-side door. Police matched these fingerprints to Legrand.

Upon further investigation, police discovered that Legrand was a convicted felon who recently completed parole. Legrand's former parole officer, Phil Rossetti, informed

3

investigators that Legrand was using a cell phone with the number 443-***-1700 (the "1700 cell phone") and living at 7700 Fredkert Avenue, Apt. B, Baltimore, Maryland. Investigators obtained the records for this phone, which showed that someone had used it in the area of the Pulaski Highway Burger King at the time of the January 23 robbery.

Based on this information, police arrested Legrand for the robbery of the Burger King as he arrived, with his minor daughter, at the office of his former parole officer. During his booking, police asked Legrand for his phone number; in response, Legrand provided the number for the 1700 cell phone. Legrand did not, however, have possession of the cell phone at the time.

Following Legrand's arrest, police escorted his daughter to the 7700 Fredkert Avenue residence at her request, so she could retrieve her belongings before police released her to her mother. Officers entered the residence with her. While she collected her belongings, one of the officers called the 1700 cell phone, which rang inside the apartment.

Officers then applied for a warrant to search the apartment at 7700 Fredkert Avenue. In the affidavit supporting the application, officers included, along with other evidence, the fact that the 1700 cell phone had rung inside the apartment. A judge issued the warrant and officers searched the apartment,

4

collecting the cell phone with the 1700 number, another cell phone, and multiple notices of past-due bills.

Months later, as Legrand was awaiting trial in state court, investigators asked Maria DiAngelo, the assistant manager on duty at the Burger King the night of January 23, to try to pick the assailant from a lineup. Legrand was present in this lineup as person number six. DiAngelo picked person number four, and signed the following written statement: "I chosen [sic] number four for the sole reason I remember the whole night. When I saw his face, I had a gut feeling in his eyes that told me he was the man. No other one made me feel scared like number four did. I'm positive it was him." J.A. 417.

The following day, an officer informed DiAngelo she had picked the wrong man. DiAngelo responded by disclosing that, contrary to her signed statement, she had been deciding between two individuals, number four and number six. The officer then informed her that had she picked number six, she would have been right.

Subsequent to DiAngelo's participation in the lineup, the State of Maryland dismissed charges against Legrand in favor of the United States. After further investigation and Fulford's confession to government investigators, a federal grand jury indicted Legrand on eleven counts, for crimes related to the

5

robberies of the Burger King, the gas station on Belair Road, and the Pizza Hut in Dover, Pennsylvania.

## B.

Legrand made three pretrial challenges relevant to this appeal: a motion to suppress the evidence obtained from his apartment, a motion to exclude identification evidence in the form of testimony by DiAngelo, and a challenge to the government's use of a peremptory challenge to strike an African American juror. We will describe each in turn.

## 1.

Legrand based his motion to suppress the evidence obtained from his apartment on the ground that the warrant authorizing the search was infirm. He contends that the supporting affidavit contained information gathered by police after they illegally entered his apartment with his daughter and called the 1700 cell phone. The government responded that the officers' entry into the apartment was legal because the daughter's presence created exigent circumstances, i.e., the need to assure the preservation of evidence. Hearing the sound of the ringing cell phone while in the apartment, the government argued, was equivalent to observing evidence in plain view. The government further argued that even if the officers improperly

obtained the fact of the presence of the 1700 cell phone in the apartment, the warrant was still valid because the remainder of the affidavit contained sufficient evidence to support it.

The district court denied Legrand's motion to suppress. In doing so, it eschewed the government's exigent circumstances argument in favor of its alternative contention. The district court held that even after excising the fact of the presence of the 1700 cell phone in the apartment, the affidavit submitted by the officers contained sufficient evidence to support the warrant. In so holding, the district court relied on our decision in United States v. Moses, 540 F.3d 263 (4th Cir. 2008), in which we held that a warrant issued for a residence subsequent to an illegal entry remains valid so long as sufficient untainted evidence was presented in the warrant affidavit to establish probable cause. Id. at 271.

2.

In addition to his motion to suppress, Legrand filed a motion in limine to exclude testimony by DiAngelo identifying him as the person who robbed the Burger King on January 23. Legrand based his motion on the government's proffer that it intended to elicit testimony from DiAngelo that during the lineup she was considering two men, number four--whom she ultimately picked--and number six. The government proffered

7

that it would then elicit testimony from one of the officers involved in the lineup that Legrand was number six. Legrand argued that this identification--coming after DiAngelo had (1) approved a sworn statement that she was "positive" that number four was the assailant, and (2) discussed the lineup with an officer who had informed her that she chose incorrectly--was inherently unreliable and thus a violation of his right to due process.

Subsequent to the filing of this motion in limine, the government announced that it no longer planned to elicit testimony indicating that Legrand was number six in the lineup. Instead, the government would only elicit testimony to the effect that DiAngelo was not positive when she chose number four, apparently in an attempt to dull the effect on the jury of her sworn statement identifying a person that was not Legrand. The government assured the district court that DiAngelo would not be asked to "identify[] the defendant in any way." J.A. 369. In response, Legrand's attorney did not press his motion in limine, instead stating, "we will wait and hear that testimony and we will cross-examine her as we see appropriate on that topic." Id. The district court responded, "All right. Fine. Then I will not make any ruling on this matter unless and until I need to." Id.

8

DiAngelo ultimately testified as the government proffered she would, describing her thought process in choosing person number four, and explaining that she was unsure of choosing between person number four and person number six. The government did not attempt to identify Legrand as person number six. Legrand did not object to DiAngelo's testimony at trial.

3.

After the district court disposed of the pretrial motions, jury selection began. The district court called sixty jurors for potential service in the trial. Five of these jurors were African American. The government struck one of the African American jurors for cause, leaving four. The government then used a peremptory challenge to strike one of the four remaining African American jurors, Juror 339. On the form potential jurors were asked to complete, Juror 339 had listed no occupation, and failed to answer any of the questions presented. In response to the government's striking of Juror 339, the following exchange occurred:

> [Legrand's counsel]: So I'm just making the Batson challenge for the record, your Honor. There were four African Americans on the panel. The government has struck 339, who is African American. I took a look at my notes. I don't think I have any information about him. I don't think we have an occupation or anything relating to him. So it's 25 percent of the African Americans on the panel. I just want to preserve that.

9

THE COURT: So they struck one out of four?

MR. VITRANO: Four, correct.

. . .

THE COURT: [To the government.] Do you want to put any reason on the record for striking Number 339?

[The government]: Your Honor, my understanding of Batson is that the burden is on the defense to show that there is a pattern of strikes for a particular specified class, not a percentage.[1] In other words, if there was one person on the panel of a particular race that was struck, that is not a pattern. But here, we have one out of four. So the government's position is that the defense has not even come close to meeting any kind of burden. So really, the inquiry should go no further.

THE COURT: Okay. I always ask because sometimes the government wants to go ahead anyway. But I think you're right. I don't think a prima facie case is made by the fact that out of the four African Americans remaining on the panel that would be considered for the 12, one of those, and as was pointed out, we have no information about, not even an occupation, was struck by the government. Whereas, the government did not exercise its strikes against three other African Americans that they could have. So I deny the motion.

J.A. 358–59.

The three remaining African American jurors ultimately served on the jury.

---

[1] It is undisputed that the government misstated the law.

We now turn to the testimony of Fulford, Legrand's nephew and accomplice. Fulford, then serving a sentence in state prison for his role in the Burger King robbery, testified that he had assisted Legrand in each of the three robberies. He provided extensive testimony--with his direct testimony occupying over 100 pages of trial transcript--in this regard. For example, Fulford testified that on the evening of January 23, 2008--the night of the Burger King robbery--Legrand visited him at his house and asked for help in "doing a robbery that night, because he [Legrand] needed his bills paid." J.A. 800. Fulford agreed to help Legrand in this robbery because "he had been there for me when my rent was slow. . . . . So he needed help, I'm there. I didn't have no problems with it." J.A. 801. Fulford drove the Jeep Liberty belonging to Legrand's mother that night while Legrand was in the passenger seat. He described how Legrand had initially suggested robbing a clothing store but changed his mind upon arrival at the store, when he observed multiple police cars in the vicinity. Fulford testified that Legrand ultimately settled on robbing the Burger King on Pulaski Highway and that he waited in the Jeep Liberty while Legrand committed the robbery. Fulford testified that Legrand returned from the Burger King, tossed his gun into the vehicle, and proceeded to pick up cash from the ground outside

11

the vehicle that he had dropped. Fulford then described the police chase that ultimately ended in his arrest and Legrand's escape.

Fulford's testimony about the Burger King robbery was supported by ample additional evidence. The testimony of Officer Ruth, who arrested Fulford, corroborated Fulford's testimony about the chase following the robbery. The physical evidence collected from the Jeep Liberty--particularly Legrand's fingerprints on the front passenger-side door--corroborated Fulford's testimony that Legrand had been in the passenger seat. Legrand's participation in the Burger King robbery was further supported by cell phone data showing that the 1700 cell phone, a phone linked to Legrand through the testimony of multiple witnesses, was (1) used in the vicinity of the Burger King at the time of the robbery, and (2) used to make calls to various police stations and detention centers shortly after Fulford's arrest. Finally, there was the damning testimony of other members of Legrand's family, who described Legrand's confession to his participation in the robbery with Fulford.

Fulford also described the robbery of the gas station on Belair Road on January 12, 2008. Legrand suggested the robbery during a visit that evening. Fulford described how he and Legrand entered the gas station, asked the attendant for a pack of cigarettes, and then pulled a gun and demanded money

12

when the attendant turned back around. Fulford testified that he held the gun while Legrand reached into the cash register to grab the money. Fulford's testimony as to the robbery of the Belair Road gas station was supported by video surveillance from the gas station clearly showing Fulford and Legrand committing the robbery in the manner described by Fulford.

Finally, Fulford testified about the robbery of the Pizza Hut in Dover, Pennsylvania, on January 21. Legrand had suggested to Fulford robbing "an easy spot up there in Pennsylvania." J.A. 860. Legrand had been casing this area for quite a while and told Fulford that he was confident that it was a prime spot for a robbery. Fulford explained that when he and Legrand arrived in Dover they drove past the Pizza Hut, and Legrand decided it would be the target of the robbery. Fulford waited in the Jeep Liberty while Legrand robbed the site. Fulford's testimony was supported by the testimony of a Pizza Hut employee who positively identified Legrand as the perpetrator, and cell tower data that (1) linked the 1700 cell phone to the Dover area at the time of the robbery, and (2) showed that the phone had received a call from a Dover pay phone shortly after the robbery, a call Fulford testified to making.

The jury convicted Legrand on all eleven counts. Legrand timely appealed.

13

II.

On appeal, Legrand repeats the issues he raised in the district court. He asserts police violated the Fourth Amendment by searching his apartment pursuant to an invalid warrant, that the government violated the Fifth Amendment by introducing DiAngelo's testimony regarding the lineup, and that the government violated the Sixth Amendment by striking Juror 339 based on the juror's race. We first address Legrand's evidentiary challenges together before proceeding to the claim related to jury selection.

A.

"[T]here can be no such thing as an error-free, perfect trial . . . ." United States v. Hasting, 461 U.S. 499, 508 (1983). Pursuant to this concession to reality, appellate courts will not reverse a conviction due to an error at trial if it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." Neder v. United States, 527 U.S. 1, 18 (1999). In appeals from criminal convictions, harmless error analysis serves the purpose of assuring that "unfair convictions are reversed while fair convictions are affirmed." Sherman v. Smith, 89 F.3d 1134, 1138 (4th Cir. 1996) (en banc).

14

The Supreme Court has "recognized that most constitutional errors can be harmless." Neder, 527 U.S. at 8. In consequence, we have held that a district court's denial of both a motion to suppress alleging Fourth Amendment violations and a motion to exclude an in-court identification are subject to harmless error analysis. See United States v. Ford, 986 F.2d 57, 60 n.2 (4th Cir. 1993) (motion to suppress); Satcher v. Pruett, 126 F.3d 561, 566 (4th Cir. 1997) (motion to exclude in-court identification).[2]

---

[2] We do not conduct a harmless error analysis for Legrand's challenge to the process of jury selection in this case. Constitutional errors not susceptible to harmless error analysis are those that affect the framework within which the trial proceeds, rather than simply being an error in the trial process itself. These "structural" errors require automatic reversal. United States v. Poole, 640 F.3d 114, 118 (4th Cir. 2011). Although this court has not yet considered the issue, most circuit courts have held that the use of peremptory challenges in jury selection in a racially discriminatory manner, as Legrand alleges here, is a structural error. See, e.g., Winston v. Boatwright, 649 F.3d 618, 627-28 (7th Cir. 2011); Forrest v. Beloit Corp., 424 F.3d 344, 349 (3d Cir. 2005); Tankleff v. Senkowski, 135 F.3d 235, 248 (2d Cir. 1998); Ford v. Norris, 67 F.3d 162, 170-71 (8th Cir. 1995); United States v. Thompson, 827 F.2d 1254, 1261 (9th Cir. 1987). Indeed, in its decision barring the use of peremptory challenges in jury selection in a racially discriminatory manner, the Supreme Court ordered that the conviction be reversed if the defendant, on remand, demonstrated such an error, "without pausing to determine whether the improper exclusion of jurors made any difference to the trial's outcome." Davis v. Sec'y for Dept. of Corrections, 341 F.3d 1310, 1316 (11th Cir. 2003) (citing Batson v. Kentucky, 476 U.S. 79, 100 (1986)). Accordingly, although not conclusively deciding whether such an error is structural, we will eschew harmless error analysis of this alleged error.

Errors in the admission of evidence are harmless when, after excising the challenged evidence, there remains "an abundance of other evidence" supporting the verdict. United States v. Johnson, 400 F.3d 187, 197 (4th Cir. 2005); accord United States v. Mobley, 40 F.3d 688, 694 (4th Cir. 1990) (reviewing non-challenged evidence introduced at trial to determine whether erroneous admission of certain evidence was harmless).[3] Without taking a position as to whether the district court improperly admitted evidence of the search and DiAngelo's identification testimony, we find that any error would have nevertheless been harmless.

The challenged evidence--the presence of the 1700 cell phone in Legrand's apartment, the past-due bills, and DiAngelo's testimony--went only to Legrand's participation in the robberies (and not, for example, to his alleged obstruction and witness intimidation). As detailed above, the government introduced significant other evidence demonstrating his participation in

---

[3] In rare cases, the erroneous admission of evidence--most often involving a defendant's confession--will be determined to have had such a corrosive effect on the jury that it cannot be rendered harmless by other evidence. See Arizona v. Fulminante, 499 U.S. 279, 296 (1991) ("In the case of a coerced confession . . . the risk that the confession is unreliable, coupled with the profound impact that the confession has upon the jury, requires a reviewing court to exercise extreme caution before determining that the admission of the confession at trial was harmless."). Such circumstances are not present in this case.

the robberies.  Indeed, even the specific purpose served by some of the challenged evidence was duplicated by other evidence. The presence of the 1700 cell phone in Legrand's apartment and the past-due bills, for example, demonstrated Legrand's connection to the cell phone used in the vicinity of the Pizza Hut and Burger King robberies and Legrand's financial motive for the robberies, respectively.  But Legrand himself proved his connection to the cell phone by listing its number as his own when he was arrested, and his financial motive was presented separately to the jury through the testimony of Fulford. Meanwhile, the challenged identification evidence tying Legrand to the Burger King robbery simply replicates Fulford's testimony that he was Legrand's accomplice in the robbery, Legrand's family members' testimony that Legrand confessed to the robbery, the physical evidence linking Legrand to the Jeep Liberty, and the cell tower data linking Legrand's cell phone to the area of the Burger King.  Thus, "it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilty" as to all counts against Legrand, even absent the challenged evidence.  Johnson, 400 F.3d at 198 (quotation marks omitted).

B.

We now turn to Legrand's Sixth Amendment challenge. Legrand argues that the government used a peremptory strike to

17

remove Juror 339 based only on his race, thus violating the Sixth Amendment.  See Batson v. Kentucky, 476 U.S. 79 (1986).

In Batson, the Court established a burden-shifting framework for the evaluation of a claim of racial discrimination in the use of peremptory challenges.  Initially, the burden is on the party challenging the peremptory strike to make a prima facie showing of racial discrimination.  We have described the requirements of a prima facie case thusly:

> To establish a prima facie case under Batson, a defendant must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. . . .[4]  Then, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used peremptory challenges to exclude the veniremen from the petit jury on account of their race.  Relevant circumstances may include, but are not limited to, a pattern of peremptorily striking black jurors and the government's questions during voir dire and in exercising its challenges.

United States v. Grandison, 885 F.2d 143, 145-46 (4th Cir. 1989) (quotation marks, citations, and alterations omitted).  Only after a party has made out a prima facie case is the striking party required "to come forward with a neutral explanation for challenging black veniremen."  Id. at 146.

---

[4] These two factors are not in dispute.

In reviewing a district court's conclusion as to whether a party has made a prima facie case, we do not second-guess lightly:

> The trial judge plays a pivotal role in determining a prima facie case. He or she has the opportunity to observe voir dire and the prosecution's exercise of its peremptory challenges. The trial judge also has the experience to identify a prima facie case of purposeful discrimination. . . . [A] trial judge's finding of intentional discrimination is a finding of fact . . . . Such findings are entitled to great deference, and will not be disturbed by this court unless clearly erroneous.

Id. (quotation marks, citations, and alterations omitted). Here, the district court concluded that Legrand had failed to make out a prima facie case because the only circumstance he put forth in support of his claim of discrimination was that the government had struck one of four African American jurors. Further, the district court noted that weighing against the claim of discrimination were the facts that (1) Juror 339 had refused to provide requested information, and (2) the government did not strike any of the remaining African American jurors despite its ability to do so. These were appropriate considerations by the district court, and we cannot conclude that its findings were clearly erroneous. See, e.g., id. at 147 (noting favorably that "the government could have used a remaining strike against [the remaining African American jurors] but three times declined to do so"); United States v. Malindez,

19

962 F.2d 332, 333 n.2 (4th Cir. 1992) ("The fact that 50 percent (four out of eight) of the Government's peremptory challenges were exercised against African American veniremen, standing alone, is insufficient to establish a prima facie case of purposeful discrimination . . . .").

Legrand asserts that the district court clearly erred in relying on an incorrect legal standard, i.e., that to establish a prima facie case, Legrand was required to show a discriminatory <u>pattern</u> of strikes. It was, however, the government, not the district court, that articulated this admittedly erroneous standard.[5] The record reflects that the district court merely considered the lack of a pattern of discriminatory strikes, among other factors, in concluding that Legrand had failed to make out a prima facie case.

Accordingly, we reject Legrand's Sixth Amendment challenge to his convictions.

---

[5] Legrand also complains of the government's failure to proffer a legitimate reason for the peremptory strike when questioned by the district court. Although it might have been helpful for the government to proffer one, Legrand may not use the lack of such an explanation in trying to make a prima facie case in the first instance. <u>See</u> <u>Grandison</u>, 885 F.2d at 146.

III.

For the foregoing reasons, Legrand's convictions are

AFFIRMED.